**LAZY DOG RANCH, a New Jersey partnership, Petitioner,**

v.

**TELLURAY RANCH CORPORATION, a Colorado corporation; Charles Ergen; and Dan Levere, Respondents.**

No. 97SC529.

Supreme Court of Colorado.

Sept. 14, 1998.

As Modified on Denial of Rehearing Oct. 19, 1998.

Tisdel, Hockersmith & Burns, P.C., Robert B. Burns, Ouray, for Petitioner.

Cashen, Cheney & Thomas, Robert J. Thomas, Montrose, for Respondents.

Justice MARTINEZ delivered the Opinion of the Court.

The issue before us is the proper approach for determining whether a particular use of an expressly granted easement over land is permitted. We granted certiorari to decide whether the doctrine of collateral estoppel precludes a challenge to a particular use of an easement when the dimensions of the easement have been established by previous litigation.[1] Because the size of the easement and the use of the easement are distinct concepts, we hold that a party to the earlier litigation is not estopped from challenging a particular use, even if the challenged use takes place within the dimensions of the easement. We hold further that the determination of whether a particular use of an easement by grant is permitted depends in part upon the reasonableness of the challenged use in light of the language and circumstances of the grant. Accordingly, we reverse the judgment of the court of appeals in *Lazy Dog Ranch v. Telluray Ranch Corporation*, 948 P.2d 74 (Colo.App.1997), and remand the case for further proceedings consistent with this opinion.

I.

This case continues a protracted dispute between landowners in Ouray County, Colorado. Petitioner Lazy Dog Ranch ("Lazy Dog") and respondent Telluray Ranch Corporation ("Telluray") each own portions of a formerly unified property. For several decades prior to ownership by either Lazy Dog or Telluray, the single parcel was owned by Pleasant Valley Ranch ("Pleasant Valley"). In 1986, Lazy Dog's predecessor in title, Kenneth Vilkin, purchased approximately 530 acres from Pleasant Valley. Lazy Dog acquired this property in 1990. In 1991, Pleasant Valley conveyed the remainder of its property, approximately 6,200 acres, to Telluray.

As part of a plan to subdivide its property, Lazy Dog began improving various access roads across its property. One of these access roads, known as the Railroad Grade, actually crosses a small section of Telluray's property. After Telluray placed gates across this portion of the Railroad Grade, Lazy Dog sought a declaratory judgment in the District Court of Ouray County to determine its rights of access across Telluray's property and whether Telluray had a right to place gates across this access. Telluray also

---

1. We granted certiorari as to the following issues:

Whether the court of appeals erred by applying collateral estoppel precluding Lazy Dog from litigating whether Telluray Ranch Corporation could build a thirty-foot wide road upon its sixty-foot wide granted easement.

Whether the court of appeals erred by affirming the trial court's determination that a balancing of interests was not necessary and that the thirty-foot wide road was a reasonably foreseeable improvement at the time of the grant.

Whether the court of appeals erred by not addressing the trial court's determination that the fact that the easement in question may benefit other property not defined in the original grant of the easement is of no consequence.

sought determination of its claim of rights of access across Lazy Dog's property.

By an order dated May 13, 1994, the trial court made several rulings. First, the court held that the land sale contract between Vilkin and Pleasant Valley (the "Vilkin Contract") did not merge into the warranty deed conveying the Lazy Dog property to Vilkin. Thus, the provisions of the Vilkin Contract not contained in the deed remained fully enforceable. Second, relying in part upon the Vilkin Contract, the court determined that Lazy Dog owned a sixty-foot wide easement across Telluray's (formerly, Pleasant Valley's) property along the Railroad Grade, among other roads. Third, the court balanced the interests of both parties in the subject land and fashioned a compromise in which Telluray was allowed to cross the Railroad Grade with cattle guards rather than gates.

Finally, the court found that Telluray owned various easements across Lazy Dog's property. The court found that the warranty deed, as modified by a correction deed, between Pleasant Valley and Vilkin "is not ambiguous and reserves to Pleasant Valley Ranch and its successors and assigns a non-exclusive right of way access and utility easement 60 feet in width" along certain roads across Lazy Dog's property, including one known as the Sigafus Cutoff.

Thus, the trial court's ruling secured to Telluray, as successor of Pleasant Valley, a sixty-foot wide right of way for access and utilities upon the Sigafus Cutoff across Lazy Dog's property. Lazy Dog subsequently filed a Motion to Amend Findings and Judgment in which it requested that the trial court order's reflect that the historic use of the Sigafus Cutoff was for "agricultural purposes," including the moving of cattle to and from the high country. The trial court denied this request because the easements owned by Telluray were based on documentary grants, rather than on use. Upon review by the court of appeals, the trial court's order was affirmed in all respects. *See Lazy Dog Ranch v. Telluray Ranch Corp.,* 923 P.2d 313 (Colo.App.1996) (*"Telluray I"*), *cert. denied,* No. 96SC252 (Colo. Sept. 3, 1996).

After the trial court's order in *Telluray I,* Telluray implemented plans to develop its easement along the Sigafus Cutoff. According to Lazy Dog, the Sigafus Cutoff was historically a ten to twelve-foot wide jeep trail along a steep incline. Telluray announced its intention to expand the existing road to thirty feet in width with altered grades. Lazy Dog alleges that Telluray marked all trees within the sixty-foot wide easement for cutting and requested that electric and telephone service to the lots within the Lazy Dog subdivision be shut off in preparation for bulldozing.[2] Thereupon, Lazy Dog commenced the litigation that is presently before this court.

Lazy Dog initiated a declaratory judgment action in the Ouray County District Court requesting a determination of Telluray's rights to access across the easement, and requested injunctive relief enjoining Telluray from proceeding with its development plans. Lazy Dog alleged that Telluray's plans to bulldoze and grade the right of way for a road thirty feet in width would cause severe damage to Lazy Dog's property. Specifically, because of the steep incline involved, Telluray would be required to make deep and wide cuts into the terrain in order to grade the Sigafus Cutoff for a thirty-foot wide road. Thus, Telluray's plans would destroy those underground utilities within the sixty-foot wide easement, remove many trees, and cut impassable swaths across the Windy Road where it intersects with the easement, thereby preventing access to the upper portion of the Lazy Dog subdivision. In addition, Lazy Dog alleged that Telluray had no need to improve the Sigafus Cutoff in the proposed manner because Telluray could use (as it had in the past) the existing Windy Road, which begins and ends in approximately the same

---

**2.** As part of its subdivision development, Lazy Dog had installed underground electric, telephone and water service throughout portions of its property. Additionally, Lazy Dog had improved a rough track across its property in order to provide access by passenger car to all lots in the subdivision. This improved road is known as the Windy Road, ostensibly because of the winding switchbacks necessary to accomplish the gain in altitude from the southern portion of Lazy Dog's property to the northern portion.

locations as the Sigafus Cutoff. Thus, Lazy Dog maintained that Telluray should not be allowed to implement its plans to improve the easement because the improvements were unreasonable and unnecessary.[3]

Telluray responded to Lazy Dog's complaint with a Motion to Dismiss, which the trial court treated as a Motion for Summary Judgment. After a hearing on January 23, 1995, the trial court granted Telluray's motion. The court first ruled that the extent of an easement based upon a grant is defined exclusively by the language of the grant. The court found that the import of the grant's language was established by the *Telluray I* litigation, and thus Lazy Dog was barred by res judicata from relitigating this issue. According to the court, the earlier litigation established that the grant's language was unambiguous and reserved to Telluray a sixty-foot wide easement for access and utilities.

The trial court acknowledged that "the exact scope of the easements" was not litigated in *Telluray I;* however, the court found that the issue of proper use was subsumed within the issue of the easement's width. The court found that, because Telluray's contemplated use would occur within the sixty-foot wide right of way, the use was permitted as a matter of law:

> [T]he scope and use of the easement, so long as consistent with a right-of-way access and utility easement, is really *unfettered* as a matter of law and the Plaintiff *cannot in any way restrict* Defendants' use and modification of the easement consistent with its use as an access and utility easement.

(Emphasis added.) Because the court found that historic use, reasonableness, and necessity were not relevant to the question of whether Telluray could expand the Sigafus Cutoff road to thirty feet in width, the court concluded that no genuine issue of material fact existed. Accordingly, the trial court declined to hold an evidentiary hearing, and granted summary judgment in favor of Telluray.

Lazy Dog subsequently filed both a Motion to Amend Order and a Motion to Permit Filings of Supplemental Pleadings. In its Motion to Amend Order, Lazy Dog alleged that the non-merged Vilkin Contract limits Telluray's activities on the easement to "maintenance of the existing roads for the same uses and in the same historical condition as they now are." Lazy Dog requested that the court amend its order to prevent Telluray from expanding the easement beyond its historic use. The trial court denied this motion, stating the contract language was irrelevant because "we are dealing with a well-defined and unambiguous grant of easement of which Lazy Dog was aware when [it] purchased the[ ] property."

In its motion to permit supplemental pleadings, Lazy Dog asserted that it had recently learned that Telluray was using the Sigafus Cutoff to benefit property not appurtenant to the easement. Lazy Dog requested injunctive relief to prevent all use of the easement by Telluray "until such time as it can be shown that the easements can be used only for the reserved purposes for the specifically benefited property." The trial court denied this motion, ultimately concluding that "the fact that [the easement] may benefit some other property is of no consequence."

On appeal by Lazy Dog, the court of appeals first determined that "the nature, extent, and use of the easement was the subject of the litigation in *Telluray I* " and secured to Telluray a sixty-foot wide right of way across Lazy Dog's property. *Lazy Dog Ranch,* 948 P.2d at 76. The court then held that collateral estoppel barred Lazy Dog from relitigating the width of the easement. *See id.* Next, the court declared that, because a sixty-foot wide right of way was granted, Telluray's right to widen the road to thirty feet was both "reasonably foreseeable" and "clear from the deed." *Id.*

---

**3.** In an amended complaint, Lazy Dog also alleged that it reasonably relied upon Telluray's consistent use of the Windy Road in expending substantial funds to improve the Windy Road. If it had known of Telluray's plans to alter the Sigafus Cutoff and the concomitant interference with the Windy Road, Lazy Dog claims that it would never have improved the Windy Road. Lazy Dog alleges that Telluray knew or reasonably should have known of this reliance.

The court also found that there was no need for an evidentiary hearing to determine the reasonableness of Telluray's proposed use because "the easement was created by a deed that is specific, definite, and permits the use and improvements proposed by the defendant." *Id.* The court also approved of the trial court's statements which gave Telluray permission to use the easement "without limitation" and "as they see fit," provided that the use occurred within the granted right of way. *Id.* at 77. Finally, the court of appeals chose not to address Lazy Dog's claim that Telluray was using the easement to benefit inappropriate lands because the court found that this issue was not presented to or addressed by the trial court. *See id.* Consequently, the court of appeals affirmed the summary judgment in favor of Telluray.

Lazy Dog sought certiorari review by this court. Lazy Dog contends that, while it is barred from relitigating the width of the easement, it is not barred from challenging a particular use of the easement. Lazy Dog argues that, under the law of servitudes, neither party has unfettered discretion to use land burdened by an easement. Lazy Dog asserts that it is therefore entitled to a balancing of its interests in the burdened property with the interests of Telluray in the right of way. Lazy Dog also maintains that the Vilkin Contract restricts Telluray's use of the easement to historical uses. Hence, Lazy Dog claims that genuine issues of material fact exist that preclude summary judgment.

## II.

The resolution of the issues on certiorari rests upon fundamental principles of the law of servitudes, particularly as they relate to an easement created by express grant. Therefore, we will first discuss the legal precepts relevant to interpreting an easement. We will then examine how these principles control the questions before us.

4. After circulation of this Tentative Draft in early 1994, the draft was approved, subject to reasonable editorial prerogative, by the members of the American Law Institute on May 17, 1994, and will be published as part of the final Restatement (Third) of Property when the balance of the project is completed.

## A.

 An easement is a right conferred by grant, prescription or necessity authorizing one to do or maintain something on the land of another "which, although a benefit to the land of the former, may be a burden on the land of the latter." *Barnard v. Gaumer,* 146 Colo. 409, 412, 361 P.2d 778, 780 (1961); *see also Wright v. Horse Creek Ranches,* 697 P.2d 384, 387 (Colo.1985) (easement confers upon the holder enforceable right to use property of another for specific purposes). An easement is said to be "appurtenant" to property when the benefit or burden of the easement "runs with" an interest in property. Owners of the property are entitled to the benefit, or subject to the burden, of the easement due to their relation to the property. Thus, when their property interest terminates so does their connection to the easement. *See* Restatement (Third) of Property: Servitudes § 4.5 cmt. c (Tentative Draft No. 4, 1994) ("Restatement (Third) of Property").[4] The property burdened by the easement is customarily known as the "servient estate," while the property benefited by the easement is called the "dominant estate." *See Bijou Irrig. Dist. v. Empire Club,* 804 P.2d 175, 183 (Colo.1991).

 An easement, regardless of the manner of its creation, does not carry any title to the land over which it is exercised, nor does it serve to dispossess the landowner.[5] *See Wright,* 697 P.2d at 387; *Barnard,* 146 Colo. at 412, 361 P.2d at 780. The owner of the servient estate enjoys all the rights and benefits of proprietorship consistent with the burden of the easement; while the rights of the owner of the dominant estate are limited to those connected with use of the easement. *See Bijou Irrig. Dist.,* 804 P.2d at 183; *Barnard,* 146 Colo. at 412, 361 P.2d at 780.

5. This rule is altered somewhat in the case of an easement that is clearly and expressly designated as "exclusive" (i.e., for the sole enjoyment of the easement holder).

The extent of an expressly created easement (i.e., the limits of the privileges of use authorized by the easement) is determined by interpreting the conveyance instrument. *See, e.g., Bijou Irrig. Dist.,* 804 P.2d at 183 (examining the statute creating the easement); Restatement (Third) of Property § 4.1(1)(a). Where the instrument is a deed, we construe the instrument as we would any deed. Our paramount concern in construing a deed is to ascertain the intentions of the parties. *See Notch Mountain Corp. v. Elliott,* 898 P.2d 550, 557 (Colo.1995); *Percifield v. Rosa,* 122 Colo. 167, 177, 220 P.2d 546, 551 (1950).

The proper method for determining the intentions of the parties to a deed has been expressed in a number of ways. For example, in *Daum v. Conley,* 27 Colo. 56, 59 P. 753 (1899), we examined whether the grantor of land also intended to grant title to water rights used upon the land. We explained that "whether a deed to such land conveys such right depends upon the intentions of the grantors, to be determined from the terms of the deed, or when the latter is silent as to such right, from the circumstances surrounding the transaction." *Id.* at 64, 59 P. at 756. In a subsequent case, we affirmed the court of appeals' decision in *Eisenhart v. Denver,* 27 Colo.App. 470, 150 P. 729 (1915), *aff'd,* 64 Colo. 141, 170 P. 1179 (1918), in which the court held that the rights of the parties to a deed were controlled by the interpretation of the deed "in accordance with the facts and circumstances attending its execution, so as to learn the intentions of the parties." 27 Colo.App. at 478, 150 P. at 732.

However, in *Brown v. Kirk,* 127 Colo. 453, 257 P.2d 1045 (1953), we expressed the proposition somewhat differently. In *Brown,* we stated, without citation, that "when a deed is unambiguous and unequivocal, the intentions of the parties thereto must be determined from the deed itself, and extrinsic evidence to alter, vary, *explain* or change the deed by any such evidence is not permissible." *Id.* at 456, 257 P.2d at 1046 (emphasis added). The so-called "four corners" principle was thereby introduced into our case law. This principle provided that a court should not look beyond the instrument for any purpose unless it first determined that the deed was ambiguous. *See Notch Mountain Corp.,* 898 P.2d at 557; *O'Brien v. Village Land Co.,* 794 P.2d 246, 249 (Colo.1990); *Radke v. Union Pacific R.R.,* 138 Colo. 189, 209, 334 P.2d 1077, 1088 (1959).

A thorough examination of our case law reveals, however, that we have not always applied a rigid "four corners" approach to interpreting a deed. In *O'Brien v. Village Land Co.,* for example, we explained that the question of whether a deed is ambiguous may be answered by reference to extrinsic evidence:

> In determining whether a deed is ambiguous, a trial court may conditionally admit extrinsic evidence on that issue, but if it is ultimately determined that the document is unambiguous, the conditionally admitted evidence must be stricken.

794 P.2d at 249 n. 2. In doing so, we were guided by principles of contract law, according to which "courts frequently admit extrinsic evidence provisionally, not for the purpose of 'varying or contradicting' the writing, but to determine the fact that it is indeed unambiguous." 4 Samuel Williston, *A Treatise on the Law of Contracts* § 601, at 311 (Jaeger ed.1961); *see O'Brien,* 794 P.2d at 249 n. 2 (citing Williston and *Pepcol Mfg. Co. v. Denver Union Corp.,* 687 P.2d 1310 (Colo. 1984)).

The use of extrinsic evidence to determine the meaning of a deed's language reflects an approach to interpreting deeds which is similar to that used in interpreting other written instruments, and has been endorsed by the Restatement (Third) of Property. *See* Restatement (Third) of Property § 4.1 cmt. c ("Expressly created servitudes are typically created as the result of contractual transactions, and are properly interpreted according to interpretive rules of the law of contracts."). Accordingly, the Restatement (Third) of Property has eschewed a strict "four corners" rule in favor of a more context-based inquiry. The Restatement (Third) of Property first notes that "a servitude should be interpreted to give effect to and be consistent with the intentions of the parties to an expressly created servitude." *Id.* § 4.1(1)(a). It explains further that "the

intention of the parties to an expressly created servitude is ascertained from the servitude's language *interpreted in light of all the circumstances." Id.* § 4.1 cmt. c (emphasis added); *see also* 7 Thompson, *Thompson on Real Property* § 60.04(a), at 451 (Thomas ed.1994); 25 Am.Jur.2d *Easements* § 84 (1996).

The notion that circumstances surrounding the grant may be relevant to interpreting the language of the grant is not a new one. In 1944, the first Restatement of Property discussed the purpose and operation of this principle. *See* Restatement (First) of Property § 483 (1944) ("Restatement (First) of Property"). The Restatement (First) of Property explains that "it is often impossible to interpret language apart from the circumstances under which it was used." *Id.* § 483 cmt. d. The Restatement (First) of Property then notes that the relative importance of the circumstances surrounding the conveyance in ascertaining the meaning of a conveyance depends upon the facts of each case:

> [T]he relative proportion of the contribution of the language of the conveyance and of the circumstances in the light of which the language is construed varies from case to case. In one case, the language will be so clear and complete that little aid may be required from the circumstances; in another, the language may be so incomplete that little aid can be secured from it and much may be required from the circumstances.

*Id.* § 483 cmt. e. Hence, the language of the conveyance (be it general or specific) is the basis for reference to surrounding circumstances. In cases where the language specifically and completely addresses the issue at hand, there will be no need to look to the surrounding circumstances.

In light of these principles, several other jurisdictions have rejected a strict "four corners" rule in favor of a more flexible approach to determining the intent of parties to a deed. *See, e.g., Penn Bowling Recreation Ctr. v. Hot Shoppes, Inc.,* 179 F.2d 64, 67 (D.C.Cir.1949); *Kolouch v. Kramer,* 120 Ida-

ho 65, 813 P.2d 876, 880 (1991); *URS Corp. v. Ash,* 101 Ill.App.3d 229, 56 Ill.Dec. 749, 427 N.E.2d 1295, 1299–1300 (1981); *Wykoff v. Barton,* 646 P.2d 756, 758 (Utah 1982); *Lakes at Mercer Island Homeowners Ass'n v. Witrak,* 61 Wash.App. 177, 810 P.2d 27, 29 (1991). The Supreme Court of Utah has provided a typical explication of this more flexible approach, especially with respect to easements:

> It is also established in this state that a deed should be construed so as to effectuate the intentions and desires of the parties, as manifested by the language made use of in the deed. Further, when the deed creates an easement the circumstances attending the transaction, the situation of the parties, and the object to be obtained are also to be considered.

*Wykoff,* 646 P.2d at 758 (quoting *Wood v. Ashby,* 122 Utah 580, 253 P.2d 351, 353 (1952)).

Thus, the weight and momentum of authority is behind the more flexible approach to interpreting a deed that we articulated in *O'Brien*,[6] and we reaffirm that approach. Moreover, upon elaboration, it becomes clear that our position in *O'Brien* closely resembles that of the Restatements of Property. In *O'Brien,* we explained that extrinsic evidence may be relevant to determining whether a deed is ambiguous. *See* 794 P.2d at 249 n. 2. If, after considering this evidence, a court decides that the language of the deed accurately and unambiguously reflects the intentions of the parties, the court should disregard the extrinsic evidence for future purposes, and give effect to the language of the deed. If, however, the court finds the deed's terms to be ambiguous, the extrinsic evidence will be a useful starting point in the court's determination of the actual intentions of the parties. *See* 4 Williston, *A Treatise on the Law of Contracts* § 601 at 310–15.

---

6. In addition to *O'Brien,* we displayed a willingness to look beyond the "four corners" of the deed in *Radke,* 138 Colo. at 210, 334 P.2d at 1088, in order to ascertain the meaning of the deed. In that case, after finding the deed's language guage "not ambiguous" and ostensibly declining to look beyond this language, we were constrained to point out that extrinsic evidence confirmed that the parties' intentions were consistent with the terms of the deed. *Id.*

Similarly, the Restatement (Third) of Property calls for a court to consider "all the circumstances" surrounding the servitude's creation to ascertain the meaning of the servitude's language (i.e., the true intentions of the parties). Restatement (Third) of Property § 4.1 cmt. c. After determining the meaning of the language, the court should give effect to it, regardless of any contrary view reflected by extrinsic evidence. Accordingly, both the *O'Brien* approach and the Restatement approach allow a court to consider extrinsic evidence to arrive at the meaning of a servitude's language. Under neither approach may extrinsic evidence be used to contradict the language of the written instrument; rather, extrinsic evidence is used to explain and give context to the language.[7]

In interpreting this language, it is important to recall the special role of an instrument that conveys an interest in land. The parties to an expressly created servitude generally intend to bind successors to an interest in the land for an indefinite period of time. The written instrument therefore assumes great importance as the primary source of information to prospective purchasers of the land. *See* Restatement (Third) of Property § 4.1 cmt. c. Thus, in most cases, it is not appropriate to seek a particular, idiosyncratic meaning adopted by the parties to the original instrument. Rather, "the language used in creating a servitude ordinarily should be interpreted to accord with the meaning an ordinary purchaser would ascribe to it in the context of the parcels of land involved." *Id.*

▮ Consequently, not all extrinsic evidence of the parties' intent is relevant to the interpretation of a deed. In light of the correlation between our position and that expressed by the Restatement (Third) of Property, we naturally find useful the examples of extrinsic evidence described therein.

Circumstances relevant to interpreting the language of a servitude include

> the location and character of the properties burdened and benefited by the servitude, the use made of the properties before and after creation of the servitude, the character of the surrounding area, the existence and contours of any general plan of development for the area, and consideration paid for the servitude.

*Id.; see also* Restatement (First) of Property § 483. This list of relevant considerations is designed to implement the primary purpose of effectuating the true intentions of the parties to the granting instrument (to the extent that an ordinary purchaser of the land could ascertain those intentions).

**B.**

There may be instances where the instrument creating the servitude is silent as to a matter that affects the operation of the servitude. *See* Restatement (Third) of Property, Introductory Note to Chapter 4; *see also Bijou Irrig. Dist.,* 804 P.2d at 183–84 (statute creating easement silent as to servient owner's right to recreational use of reservoir); *Schold v. Sawyer,* 944 P.2d 683, 685 (Colo. App.1997) (deed silent as to propriety of gates across the easement); *Wulf v. Tibaldo,* 680 P.2d 1348, 1350 (Colo.App.1984) (instrument creating easement silent as to its width). In some cases, the intentions of the parties regarding a particular matter may be difficult to determine, even after reference to all the relevant circumstances. In these cases, courts have developed a system of "default rules" that supply necessary terms of the easement. *See, e.g.,* Restatement (Third) of Property, Introductory Note to Chapter 4, §§ 4.3 to 4.12. These rules, in large part, determine the rights of the respective landowners according to a reasonableness standard because it is presumed that, absent clear authorization in the written

7. For further explanation of this point, the Restatement (Third) of Property directs us to the Restatement (Second) of Contracts, which observes, "It is sometimes said that extrinsic evidence cannot change the plain meaning of a writing, but meaning can almost never be plain except in context." Restatement (Second) of Contracts § 212 cmt. b.; *see also* 3 Arthur Corbin, *Corbin on Contracts* § 579, at 421–22 (1960) (admitting extrinsic evidence for the purpose of discovering the meaning of an agreement's terms does not violate the parol evidence rule because such evidence "does not vary or contradict the written words; it determines that which cannot be varied or contradicted").

instrument for the particular use, the parties to the original instrument did not intend unreasonable use of the easement. Those default rules of reasonableness that are relevant to the instant case are discussed below.

 As previously explained, where an easement is non-exclusive in nature, both the holder of the easement and the owner of the land burdened by the easement have rights to use the property. Consequently, the interests of both parties must be balanced in order to achieve due and reasonable enjoyment of both the easement and the servient estate. *See Riddell v. Ewell,* 929 P.2d 30, 31 (Colo.App.1996); *Hornsilver Circle, Ltd. v. Trope,* 904 P.2d 1353, 1357 (Colo.App.1995); *Osborn & Caywood v. Green,* 673 P.2d 380, 383 (Colo.App.1983); Restatement (Third) of Property § 4.9 cmt. c; 7 Thompson, *Thompson on Real Property* § 60.04(a)(1), at 451; 25 Am.Jur.2d *Easements* § 81.

 Unless the intentions of the parties are determined to require a different result, the owner of the servient estate may make any use of the burdened property that does not unreasonably interfere with the enjoyment of the easement by its owner for its intended purpose. *See Bijou Irrig. Dist.,* 804 P.2d at 183; *Title Guar. Co. v. Harmer,* 163 Colo. 278, 281, 430 P.2d 78, 80 (1967); *Hornsilver Circle, Ltd.,* 904 P.2d at 1357; Restatement (Third) of Property § 4 .9. Conversely, the owner of the easement may make any use of the easement (including maintenance and improvement) that is reasonably necessary to the enjoyment of the easement, and which does not cause unreasonable damage to the servient estate or unreasonably interfere with the enjoyment of the servient estate. *See Bijou Irrig. Dist.,* 804 P.2d at 183; *Knudson v. Frost,* 56 Colo. 530, 535, 139 P. 533, 535 (1914); Restatement (Third) of Property § 4.10; 3 Herbert Tiffany, *The Law of Real Property* § 810, at 347 (Jones ed.1939).

 In addition, an easement holder may not use the easement to benefit property other than the dominant estate. *See Riddell,* 929 P.2d at 32; Restatement (Third) of Property § 4.11; 7 Thompson, *Thompson on Real Property* § 60.04(a)(1)(ii); 25 Am.Jur.2d

*Easements* § 86. As discussed by the Restatement (Third) of Property, the "rationale [behind this rule] is that use to serve other property is not within the intended purpose of the servitude. This rule reflects the likely intent of the parties by setting an outer limit on the potential increase in use of the easement brought about by normal development of the dominant estate." Restatement (Third) of Property § 4.11 cmt. b.

With the foregoing principles of the law of servitudes in mind, we now turn to the certiorari issues and the facts of this case.

### III.

### A.

The court of appeals held that the earlier litigation in *Telluray I* precluded Lazy Dog's challenge to Telluray's proposed use of its easement across Lazy Dog's property because the use would take place within the previously determined dimensions of the easement. *See Lazy Dog Ranch,* 948 P.2d at 76. The court of appeals found that the doctrine of collateral estoppel barred Lazy Dog's claims. We disagree.

 Collateral estoppel, or issue preclusion, bars subsequent litigation of an issue if: (1) the issue is identical to an issue actually determined in the prior proceeding; (2) the party against whom estoppel is asserted was a party or is in privity with a party to the prior proceeding; (3) there is a final judgment on the merits in the prior proceeding; and (4) the party against whom estoppel is asserted has had a full opportunity to litigate the issue in the prior proceeding. *See O'Neill v. Simpson,* 958 P.2d 1121, 1123 n. 5 (Colo.1998). Moreover, if the issue was determined in the prior proceeding but the judgment was not dependent upon that determination, collateral estoppel does not bar litigation of the issue in a subsequent action. *See Maryland Cas. Co. v. Messina,* 874 P.2d 1058, 1062 (Colo.1994); Restatement (Second) of Judgments § 27 cmt. h (1982).

 The only element of collateral estoppel at issue here is whether the issues presented in the current action are identical to issues actually and necessarily adjudicated

in *Telluray I.* To review, the trial court in *Telluray I* determined that the deed in question reserved to Telluray a non-exclusive, sixty-foot wide right of way for access and utilities upon the Sigafus Cutoff across Lazy Dog's property. The *Telluray I* trial court also determined that this right of way was based upon express grant, rather than upon historic use.[8]

In the present case, Lazy Dog does not challenge the existence or the width of the right of way, nor does it claim that the right of way is not for the general purpose of access. Rather, Lazy Dog claims that Telluray's proposed use of the right of way (bulldozing a thirty-foot wide roadway, with altered grades, within the right of way) is not permitted. That is to say, Lazy Dog maintains that there are various methods by which Telluray could make use of a sixty-foot wide right of way for access, some of which are permitted and some of which are not. For example, Lazy Dog concedes that the historic use of the easement, a twelve-foot wide jeep trail combined with occasional cattle drives over the entire sixty-foot width of the easement,[9] is permitted.

In finding that collateral estoppel was applicable to Lazy Dog's present claims, the court of appeals treated the issue of the dimensions (or the existence) of the easement as identical to the issue of the easement's proper use. *See Lazy Dog Ranch*, 948 P.2d at 76. However, in theory and in practice, these concepts are distinct. We will briefly mention a few of the many cases that recognize this distinction.

In *Aladdin Petroleum Corp. v. Gold Crown Properties*, 221 Kan. 579, 561 P.2d 818 (1977), the Supreme Court of Kansas examined an easement the specific width, length and location of which had been established. The court determined that, because the width of the easement had been expressly established, a determination of the reasonableness of the width was unnecessary. However, the court distinguished this issue from the question of whether the proposed use by the servient landowner (parking on the right of way) was permitted:

> Once the trial court determined and granted easements of definite width, length and location, any additional determination of reasonableness of width was inconsistent with the nature of the easement determined. The determination of a definite easement controls. There still remains, however, the question of whether carports for parking are a reasonable use by a servient estate under the facts of this case.

*Id.* 561 P.2d at 823. The court went on to hold that the servient owner's proposed use constituted unreasonable interference with the rights of the easement holder. *See id.* at 823–24.

In *Davis v. Bruk*, 411 A.2d 660 (Me.1980), the Supreme Judicial Court of Maine encountered a claim by owners of the dominant estate of the right to pave the easement. Although all the parties conceded the existence and location of the right of way, the court recognized the separate issue of whether paving constituted a proper use. The court upheld the trial court's denial of permission to pave the right of way:

> Even though the paving of the right of way may presumably suit the convenience of the owners of the dominant estate and provide some economic benefit, nevertheless, such material change in the surface of the right of way may give rise to an added burden on the servient estate, such as subjecting it to rapid transit of motor vehicles near the [servient owner's] home and posing safety problems to the occupants

---

8. Telluray contends that the trial court in *Telluray I* determined that the extent of Telluray's easement rights could not be limited to historic use. In fact, the trial court found that the *existence* of the easement was based upon express grant rather than upon prescription. The trial court made no findings as to the precise *extent* of Telluray's use rights, and certainly did not address the propriety of the specific use at issue in the present litigation.

9. Our description of the "historic use" of the right of way is consistent with that alleged by Lazy Dog. Because the trial court in this case granted summary judgment, it made no factual findings as to the historic use of the easement. Our reference to Lazy Dog's allegations is for illustrative purposes only, and should not be taken as an attempt to influence the findings that will eventually be made by the trial court pursuant to this opinion.

thereof which a country way may not generate.

*Id.* at 666. Similarly, the Supreme Court of Virginia has treated the propriety of paving an easement as distinct from the question of the existence and dimensions of a "private roadway." *See Hayes v. Aquia Marina, Inc.*, 243 Va. 255, 414 S.E.2d 820, 823 (1992).

The Supreme Court of Idaho dealt with a contention that a deed which created "a right of way for ingress and egress" of a specific width did not include the right to build a road upon the right of way. *Kolouch*, 813 P.2d at 880. Rather than consider the propriety of this particular use as subsumed within the issues of the easement's boundaries or general purpose for access, the court treated the question of proper use as a separate inquiry. The court upheld the trial court's conclusion that construction of a road was both reasonable and consistent with the parties' intent, noting that issues of reasonableness and intent are questions of fact for the trial court. *See id.*

In addition to those discussed above, we find numerous cases from other jurisdictions which recognize the distinctions among the existence, dimensions and proper use of an easement. *See, e.g., Perry v. Snow*, 165 Mass. 23, 42 N.E. 117, 118 (1895); *Lorenc v. Swiderski*, 109 N.J. Eq. 147, 156 A. 465, 465 (N.J.Ch.1931); *Kennedy v. Bond*, 80 N.M. 734, 460 P.2d 809, 812 (1969); *Wykoff*, 646 P.2d at 759; *Bard Ranch Co. v. Weber*, 557 P.2d 722, 727 (Wyo.1976).

Furthermore, the line of Colorado cases, including the court of appeals' decision in *Telluray I*, that address the question of whether a servient owner may cross a right of way with gates or other obstructions underscores the unique question of proper use. *See, e.g., Fortner v. Eldorado Springs Resort Co.*, 76 Colo. 106, 118, 230 P. 386, 391 (1924); *Schold*, 944 P.2d at 685; *Telluray I*, 923 P.2d at 316. In these cases, the boundaries of the right of way were not in dispute; rather, the controversy involved the permitted use (with-

in those boundaries) of the right of way by the dominant and servient owners.[10]

Finally, we note that our decision in *Bijou Irrigation District* rested in part upon the conceptual distinction between the existence (or dimensions) of an easement and the permitted use thereof. *See* 804 P.2d at 183–84. In that case, the right of the irrigation district to maintain the reservoir over the property of the landowners was not in question. Rather, the case concerned the right of the irrigation district, as easement owner, to enjoin the landowners' use of the reservoir within the boundaries of the easement. Our analysis was premised on the notion that the existence and dimensions of the easement were not dispositive of the question of permitted use. *See id.*

Turning once again to the present case, it is clear that the litigation in *Telluray I* resolved only the easement's existence, width and purpose for access and utilities. The precise extent of the parties' rights to use the easement was not actually litigated or determined in *Telluray I*. Nor was the propriety of Telluray's present proposal an issue in the prior proceeding. Accordingly, Lazy Dog's present claims are not barred by collateral estoppel.

### B.

The trial court below entered summary judgment in favor of Telluray because it found that no genuine issues of material fact existed. *See* C.R.C.P. 56(c) (summary judgment appropriate where "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law"). This holding was premised on the belief that the historic use of the easement, as well as the reasonableness and necessity of Telluray's proposed use, were irrelevant to the question at hand. The trial court found these considerations irrelevant because it determined that the language of the deed (and the holding of *Telluray I*) expressly conferred upon Telluray the right to implement its plans.

---

**10.** Notably, the courts in these cases did not find that the owner of the dominant estate had the right to unfettered use within the boundaries of the easement. Rather, the courts held that the easement owner had the right to be free from unreasonable interference with the use of the easement.

The deed upon which the holding in *Telluray I* was based contains the following language reserving the easement to Pleasant Valley (Telluray's predecessor in title):

> Reserving unto Grantor, its successors and assigns, a non-exclusive right of way, access and utility easement sixty (60) feet in width upon ... existing roadways passing through the property above described ....

It was established in *Telluray I* that the Sigafus Cutoff qualifies as an "existing roadway" upon Lazy Dog's property.

We conclude that the above language, considered alone, does not answer the question of whether Telluray's proposed use of the right of way should be permitted. The language establishes only the width, approximate location and general purpose of the right of way. It does not address the propriety of any particular use (within the specified width) of the easement by either party. *See* discussion *supra* Part III.A. The grant is silent as to whether the right of way should be maintained in its historic condition or, if not, which improvements were intended by the parties to the deed.

As explained in Part II of this opinion, the question of whether Telluray's proposed use is permitted should be informed by a number of factors. First and foremost, the intention of the parties to the deed should be given effect. To this end, the language of the deed should be construed in light of all the circumstances. *See* discussion *supra* Part II.A. Second, if the reviewing court cannot determine the actual intentions of the parties with respect to Telluray's proposed use, the Court should refer to the principles relating to reasonable use of the easement. *See* discussion *supra* Part II.B. To reiterate, although the owner of the servient estate may make all uses of the property consistent with the burden of the easement, the servient owner may not unreasonably interfere with the enjoyment of the easement by the easement holder. The easement holder may make any use or improvement of the easement reasonably necessary for enjoyment of the easement.[11] Absent clear authorization in the deed, however, the easement holder may not cause unreasonable damage to the servient estate or unreasonably interfere with its enjoyment.[12] Furthermore, the easement holder may not use the easement to benefit property other than the dominant estate.

The determinations of intent and reasonableness, after consideration of all the relevant circumstances, are largely questions of fact. *See, e.g., Schold,* 944 P.2d at 684; *Kolouch,* 813 P.2d at 880; *Hayes,* 414 S.E.2d at 823; Restatement (Third) of Property § 4.10 cmt. d; 7 Thompson, *Thompson on Real Property* § 60.05(a). Lazy Dog has alleged, with some support in the record, that Telluray's proposed expansion of the road is (1) unreasonable, (2) contrary to the intentions of the parties to the deed, and (3) designed to benefit property other than the dominant estate. Because Lazy Dog presented genuine issues as to these material facts, summary judgment in this case was improper. Lazy Dog's complaint is sufficient to require an evidentiary hearing and specific findings of fact.

## IV.

We hold that Lazy Dog is not barred by collateral estoppel from challenging a particular use of an easement simply because the use takes place within the dimensions of the easement established by prior litigation. In addition, we hold that genuine issues as to material facts exist concerning the permissi-

**11.** The Restatement (Third) of Property observes that "the manner, frequency, and intensity of the beneficiary's use of the servient estate may change over time to take advantage of developments in technology and to accommodate normal development of the dominant estate." Restatement (Third) of Property § 4.10.

**12.** In granting summary judgment, the trial court relied heavily upon the court of appeals' decision in *Pickens v. Kemper,* 847 P.2d 648 (Colo.App. 1993). In *Pickens,* the court stated that extrinsic evidence is never relevant to the interpretation of a deed unless the deed is first determined to be ambiguous. The court also appeared to hold that the owner of a servient estate may not obstruct or utilize any portion of a right of way under any circumstances. *See id.* at 650–51. In a subsequent case, a different division of the court of appeals termed the language of *Pickens* "unnecessarily broad," and presented a narrower reading of *Pickens. Schold,* 944 P.2d at 685. Thus, the breadth of the holding in *Pickens* is unclear. To the extent that *Pickens* is inconsistent with this opinion, it is hereby overruled.

bility of the challenged use in this case. Accordingly, we reverse the judgment of the court of appeals and remand with directions to return the case to the trial court for further proceedings consistent with this opinion.