*Gray v. Treder*, No. 88-2-11 Wncv (Teachout, J., May 14, 2015)

[The text of this Vermont trial court opinion is unofficial. It has been reformatted from the original. The accuracy of the text and the accompanying data included in the Vermont trial court opinion database is not guaranteed.]

## STATE OF VERMONT

| | |
|---|---|
| **SUPERIOR COURT** | **CIVIL DIVISION** |
| **Washington Unit** | **Docket # 88-2-11 Wncv** |

**MATTHEW GRAY and ERIK GRAY,**
    **Plaintiffs**

**v.**

**MARTHA TREDER, JOHN MUSCARELLE,**
**ROBERT MUSCARELLE, JOSEPH MUSCARELLE, III,**
**ANNE HERRERA, EDWARD F. & JUDITH C. GODFREY,**
**AVILDA & HOWARD WHITTLE, JACQUELINE M. AMBRIANO,**
**RETA (KATHAN) GOSS, WAYNE KATHAN, FAY KATHAN,**
**WENDELL M. KATHAN, FRANCIS R. KATHAN, and**
**VINCE & DIANE GAUTHIER,**
    **Defendants**

### FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER

This matter came before the court for final hearing on the merits on March 9,10, and 11, 2015. Plaintiffs are represented by Attorney Paul S. Gillies. Defendants Muscarelle are represented by Attorney Carl H. Lisman. Defendants Godfrey are represented by Attorney Kevin M. Henry. Defendants Whittle are represented by Attorney Shannon Bertrand. All parties and their attorneys attended a site visit conducted by the court on December 22, 2014 prior to the presentation of evidence. Post-trial legal memoranda were filed.

In the remaining claim this case, following dispositive rulings on other claims, Plaintiffs seek a declaration that they are entitled to a way of necessity for access to a parcel they own in Warren known as the "Eaton Lot," and they seek a declaration of the location of such access. Defendants Muscarelle, Godfrey, and Whittle are all owners of land or property interests that would be affected by such a declaration. Other Defendants are owners of lands over which access might be or have been a possibility at some point in the case.

### Findings of Fact

The Eaton Lot consists of 90 wooded acres located in the Town of Warren on the western slope of Roxbury Mountain. Its eastern boundary is the Roxbury Town Line and is on steep land at or near the top of Roxbury Mountain. The lot has no frontage on a

public road and no deeded access to a public road. In the 1800s it was probably landlocked, but as of 1941, an owner named Brooks owned both the Eaton Lot, which was the southern half of the original Lot 11 of Warren lands, and adjacent land to the west, which was the southern half of the original Lot 12 of Warren lands. This adjacent land to the west, the southern half of the original Lot 12, will be called the "Front Lot" in this decision. In 1948, the western boundary of the Front Lot ran along a public highway that now is called Senor Road, and the road continues to exist in the same location. Most of the Defendants in this case are current owners of Front Lot lands.

In 1948, Brooks conveyed the Front Lot to Lester H. and Arlene Senor, keeping the Eaton Lot in his ownership. He reserved certain rights concerning the Front Lot which have been the subject of prior rulings in this case. The effect of the rulings is that he did not reserve any express easement across the Front Lot for access to the Eaton Lot. There is specific evidence that Brooks engaged in logging activities on the Front Lot before and after selling it to Senor, including using logging roads across the Front Lot to take out logs. There is also some evidence suggesting that he also engaged in logging on the Eaton Lot.

There are no visible logging or other roads or pathways of any kind leading from the Eaton Lot continuously across the Front Lot to Senor Road at the present time. There are three physical features at the back of the Front Lot that suggest remnants of portions of a logging road. First, there is an open line through woods where there are no tall trees down the center but tall trees on either side, suggesting that it was once a cleared roadway. Second, there is a length of a 10 foot wide depressed area the width of an old roadway with what have been described as "obvious wheel tracks." Finally, there is a stone wall that crosses a portion of the Front Lot, and in a line continuous with the other two features, the foundation base of the stone wall remains but the upward portion of the stone wall has been removed, creating an opening in the stone wall consistent with a roadway passing through it.

The Senors farmed on many acres in the vicinity over many years. The Front Lot remained in their ownership and undeveloped. Ownership of the Eaton Lot changed several times. The evidence suggests that owners may have done some logging on the Eaton lot, but there is no evidence of how and on what basis owners of the Eaton Lot accessed it.

In 1974, John Muscarelle's parents bought a portion of the Front Lot without road frontage but with a deeded easement across remaining Senor land. They constructed a road, now called "Old Farm Lane," from Senor Road to their lot, and built a vacation home. The land on that western slope of Roxbury Mountain has beautiful views of the valley below and mountains and Sugarbush in the distance. At the time they bought, John Muscarelle was 9 years old, and began spending a lot of time, including full summers, on the property. He never saw any old logging roads crossing the Muscarelle property. The three road fragments described above are all behind and uphill from where the Muscarelle house was built. The three road features were not visible enough for him

2

to have noticed them over the years, although they were located more recently by persons associated with the Grays in connection with this case.

At some point, the Muscarelle parcel was enlarged by the addition of another portion of the Front Lot. John Muscarelle's parents thereafter deeded the combined property to John and his siblings. He and his siblings have used the property continuously as a vacation home since 1974 for themselves and now their own children (his children are now 15, 13, and 10). It is a private and peaceful place in the country. A road located near the house for any purpose would significantly disrupt the peace and tranquility and private character of this vacation retreat property.

In 1976, the Senors sold a 10-acre portion of the Front Lot. This parcel also did not have frontage on Senor Road, but included an easement from the parcel to Senor Road across Old Farm Lane. At some point a house was built on this lot. In 1994, the Godfreys purchased this property, and have used it extensively as a vacation home since. They subsequently enlarged their parcel by buying another 12 1/2 acre portion of the Front Lot from the Senors to avoid having another house built above theirs and to maintain the peace and privacy of their vacation home. A road located near the house for any purpose would significantly disrupt the peace and tranquility and private character of this vacation retreat property.

At some point, the Whittles purchased a portion of the Front Lot that included a house. Although they have frontage on Senor Road, they do not access the house directly on Senor Road. Rather, they apparently have an easement on Old Farm Lane, and use it for access to their house. Their driveway leaves Old Farm Lane significantly closer to Senor Road than the Muscarelle or Godfrey driveways.

The Ambrianos own a parcel from the Front Lot that fronts Senor Road, and they access their property directly from Senor Road. They do not use Old Farm Lane.

The current owners of the Front Lot are the Muscarelles and Godfreys at the back end, and the Whittles and Ambrianos along Senor Road. There is one small remaining piece of the Front Lot not otherwise already described. It was identified at trial as the "blue triangle" and its ownership is unknown but it is small and not located in a place where there is any viability of locating an access road to the Eaton Lot.

Old Farm Lane leaves Senor Road and runs between the Whittle and Ambriano parcels for 800 feet, ending within the Godfrey lot. Before it reaches the Godfrey lot, the Muscarelle driveway branches off to the right toward the Muscarelle house. Where Old Farm Lane ends, the Godfrey driveway continues straight ahead, up a steep pitch, to the Godfrey house. Old Farm Lane is a private road that was named by the Town in 1998 for 911 purposes.

In 1991, Plaintiffs, who are two brothers, together with their spouses and parents, bought a parcel called the Mountain Lot, which is a wooded lot of 130 acres located adjacent to and north of the Eaton Lot. They logged it, using a road called the Woods

3

Road located on land that is not involved in this case. They believed that they had an easement on the Woods Road to access the Mountain Lot. In the early 2000s, there was a separate lawsuit concerning the Grays' right of access to the Mountain Lot. The result was that they did not prove that they had a legal right to access the Mountain Lot over the Woods Road. Thus their Mountain Lot is possibly landlocked. They began looking for other means of access.

In 2009, the two brothers only (not their spouses or parents) bought the Eaton Lot. They believed that as a result of the 1948 Brooks–Senor deed the Eaton Lot had either a deeded easement or a way of necessity over the Front Lot. In early 2010, their attorney wrote to most, if not all, of the owners of lands in the Front Lot seeking to establish a physical access road across Front Lot lands to the Eaton Lot at a mutually agreeable location. No agreement was reached and this lawsuit ensued.

The Grays have done some logging on the Eaton Lot, using access available to them by temporary permission of the Kathans, who own land to the south of both the Eaton Lot and the Muscarelles. This permission was temporary only and provides no legal right of access for the future. The Muscarelles claim that because a temporary road was physically constructed across Kathan land, the Grays have physical access and do not qualify for a way of necessity, but there is no continuing legal right to use the temporary logging road that enters the Eaton Lot from the Kathan property. Similarly, there is no legal right to access the Eaton Lot through the Mountain Lot using the Woods Road, even though the Woods Road exists on the ground physically, and there is no legal right to access the Eaton Lot through the Mountain Lot from any other direction.

The Plaintiffs have sufficiently proved that the Eaton Lot became landlocked in 1948 when Brooks conveyed the Front Lot to Senor without reserving an easement for access.

A preponderance of the evidence also shows that there has been no continuous roadway visible across the Front Lot between the Eaton Lot and Senor Road at any time between 1974 and the present.

A preponderance of the evidence also shows that prior to and in connection with this lawsuit, the Muscarelles, Godfreys, Whittles, and Ambrianos have had the opportunity to select a location for an access road to the Eaton Lot that minimizes the impact on their use and enjoyment of their properties and they have not done so.

As part of their direct case, the Grays proposed a location for a way of necessity using the three fragments described above. Such a route would locate a road very close to the Muscarelle house. It is highly desirable to locate any access road as far away from both the Muscarelle and Godfrey homes as reasonably possible to maximize avoidance of interference with their use and enjoyment of their properties, which have been established over many years with no knowledge of the possibility of a way of necessity affecting their lands.

4

The Godfrey's expert, Mr. Jewkes, a licensed civil engineer and land surveyor, proposed an alternative route that took into account other factors that are very important in determining the location of a possible way of necessity. One is the fact that there are wetlands on the Muscarelle property, and it is important to locate any road outside the 50' buffer that surrounds wetlands. Another is topography, specifically that the hillside is steep, and any roadway constructed would have to comply with current regulations for the construction of driveways, including grade limitations. His proposal takes into account Warren grade restrictions for a driveway; other restrictions may apply if the road must meet either town highway or logging road requirements. Mr. Jewkes emphasized that his proposal was one of probably many designs that could be developed to construct a road on the site. He used Old Farm Lane for a good portion of its length, but had the way of necessity leave Old Farm Lane at a point that would interfere as little as possible with the Muscarelle and Godfrey driveways and houses. See Exhibit DG.

In response, the Muscarelles' engineer proposed an alternative version with two changes that would further minimize interference with the Muscarelle property. It is shown on Exhibit V. The court finds that this location minimizes to the extent possible the inconvenience and interference to Front Lot owners of a way of necessity. It overlaps with the existing Old Farm Lane to the maximum extent, keeps away from the Muscarelle and Godfrey driveways and houses to the maximum extent possible, avoids the wetlands and wetland buffer zone, and takes into account a reasonable level of regulatory grade restrictions on road requirements. While there is no guarantee that a way at this location will meet all applicable regulatory requirements for any specific use, such a location provides access and takes into account the interests and level of intrusion onto the Muscarelles' use of their property as well as those of the holders of interests in Old Farm Lane.

## Conclusions of Law

The principal issues are whether the Grays are entitled to a way of necessity and, if so, where it will be located.

*Easement by necessity*

The first question is whether a way of ingress and egress ever arose by necessity. The Court has described the doctrine of necessity as follows:

> A way of necessity is "a fiction of law" that arises when the division and transfer of commonly owned land results in a parcel left entirely without access to a public road. In such a case, "the grantee of the landlocked parcel is entitled to a way of necessity over the remaining lands of the common grantor or his successors in title." Thus, "[t]o obtain a way of necessity, one must show that (1) there was a division of commonly owned land, and (2) the division resulted in creating a landlocked parcel." Our earlier cases described the rationale for the way of necessity as the implementation of the presumed intent of the grantor of

5

the landlocked parcel. Subsequent cases have, however, emphasized the public policy rationale that "no land be left inaccessible for the purposes of cultivation." This shift in emphasis is consistent with the development of the law in other jurisdictions. Thus, the new Restatement provision asserts that an easement by necessity "avoids the costs involved if the property is deprived of rights necessary to make it useable, whether the result is that it remains unused, or that the owner incurs the costs of acquiring rights from landowners who are in a position to demand an extortionate price because of their monopolistic position."

*Myers v. LaCasse*, 2003 VT 86A, ¶ 16, 176 Vt. 29 (citations omitted). Brooks' conveyance of the Front Lot to the Senors in 1948 left the retained Eaton Lot with no express access easement. An easement by necessity over the Front Lot for the benefit of the Eaton Lot thus arose at that time.

*The Marketable Record Title Act*

Defendants argue that any such way of necessity is no longer valid under Vermont's Marketable Record Title Act, 27 V.S.A. §§ 601–616. The Act provides that one who "holds an unbroken chain of title of record to any interest in real estate for 40 years, shall at the end of that period be deemed to have a marketable record title to the interest." 27 V.S.A. § 601(a). One who has such marketable title holds it "free and clear of any and all interests, liens, claims, and charges the existence of which depends in whole or in part upon any act, transaction, event or omission that occurred prior to such 40-year period." *Id*. § 603.

The court is not persuaded that elimination of easements by necessity is consistent with either the letter or the purpose of the Vermont Act. In *Traders, Inc. v. Bartholomew*, 142 Vt. 486, 492–93 (1983), the Court found an easement by necessity exempt from the Marketable Record Title Act because it was clearly observable due to its use. The Court did not address whether it was *per se* exempt under 27 V.S.A. § 604(a)(7), but the policy underlying easements by necessity would apply equally whether or not evidence of current use exists on the ground.

Generally, marketable record title acts are intended to "encourag[e] repose and discourag[e] controversy, by providing for the elimination of ancient defects in title." 2 Tiffany Real Prop. § 654 (3d ed.) (WL updated Sept. 2014). In other words, they relieve landowners (and real estate lawyers) of the inefficiencies and uncertainties of stale claims. Promoting the accessibility of land for current productive uses, however, is an enduring public policy that does not conflict with the policy of eliminating stale claims that otherwise represent defects in title.

6

The Grays argue that even within the operation of the Act, there is an applicable exception for an easement "granted, excepted, or reserved by a recorded instrument". 27 V.S.A. § 604(a)(7).[1]  That exception provides:

> (a)  This subchapter shall not bar or extinguish any of the following interests . . .:
>
> .    .    .
>
> (7)  Any easement or interest in the nature of an easement, or any rights appurtenant thereto granted, excepted, or reserved by a recorded instrument creating such easement or interest.

The Grays' easement arose of necessity by operation of the 1948 deed from Brooks to the Senors.  The deed did not expressly except or reserve the access easement, but the easement was created as a matter of law due to the effect of the recorded deed. The easement by necessity thus appears to fall within this exception.

Both the public policy against inaccessibility of land and the principle that statutory modifications to the common law must be clear support the conclusion that easements by necessity are not eliminated by the terms of the Marketable Title Act.  See *Langle v. Kurkul*, 146 Vt. 513, 516 (1986) ("The common law is changed by statute only if the statute overturns the common law in clear and unambiguous language, or if the statute is clearly inconsistent with the common law, or the statute attempts to cover the entire subject matter.").  Easements by necessity are exceptionally well established in the common law.  See Restatement (Third) of Property (Servitudes) § 2.15 cmt. a. ("The rule that conveyances include those rights necessary to make use of the property conveyed can be traced back in the common law at least as far as the 13th century.  A maxim dating from the time of Edward I (1239–1307) states that one who grants a thing must be understood to have granted that without which the thing could not be or exist.  From this maxim and its extended applications, developed what came to be known as the easement by necessity.").

Finally, the Grays' claim derives from a recorded deed within the statutory period. The "root" conveyance, or the conveyance that starts the period of examination under the Marketable Record Title Act, is the last one prior to a date forty years ago in the chain of title.  See 27 V.S.A. § 602(a).  Forty years prior to 2011 is 1971.  The most recent relevant conveyance before 2011 was the 1948 Brooks to Senor conveyance.  This is the conveyance in which the way of necessity arose and it thus falls within the statutory period.

For the foregoing reasons, the Marketable Record Title Act has no effect on the Grays' easement by necessity.

---

[1] The Grays also argue that the exception to the Act for an easement "the existence of which is clearly observable by physical evidences of its use" also applies.  27 V.S.A. § 604(a)(6).  This exception does not apply here based on the facts.  While there are fragments of an old way in evidence, it is not "clearly observable by physical evidences of its use" within the meaning of the statute.

*Location of the easement*

The Grays requested a determination of the location of the easement. The Grays are entitled to a "convenient, reasonable, and accessible way, having regard to the interest and convenience of the owner of the land as well as their own." *Patch v. Baird*, 140 Vt. 60, 66 (1981). The servient owners had the initial right to designate its location. *Id*. They did not do so and the Grays asked the court to. As the Restatement explains:

> If the servient owner fails to designate a suitable location within a reasonable time after requested to do so, the owner of the servitude may proceed to locate it. A location is suitable if it reasonably allows the purpose for which the servitude was acquired to be carried out while inflicting the minimum amount of damage on the servient estate. If necessary, the parties may resort to legal proceedings in which a location should be selected that strikes a balance between minimizing the damage to the servient estate and maximizing the utility to the owner of the servitude.

Restatement (Third) of Property (Servitudes) § 4.8 cmt. b. The route that appears on the overlay that is part of Exhibit V, which otherwise depicts the Godfrey property "Proposed Driveway Plan & Profile," gives the Grays convenient access to Senor Road, a public road, over Old Farm Lane and the Muscarelle property. Such route best minimizes inconveniences to Defendants. This is the location to which the Grays are entitled.

*Other issues*

The Grays' access easement shall provide access to the Eaton Lot only. The Mountain Lot is in a different ownership. The necessity that warrants the easement in this case is limited to the Eaton Lot.

The Grays are responsible for all expenses (regulatory, construction, etc.) necessary to the use of the easement.

The court notes that additional issues that might have been the subject of this case were not developed in the evidence or presented to the court for decision. The court concludes that these matters are outside of the scope of the current controversy, which is limited to the establishment and location of the easement. Related issues, such as the precise dimensions of the easement, the scope and intensity of allowable uses, contribution of expenses related to use of Old Farm Lane, etc., are outside the scope of this case. See generally *Lazy Dog Ranch v. Telluray Ranch Corp.*, 965 P.2d 1229, 1238–40 (Colo. 1998) (explaining in a similar context that these are discrete issues and the parties are not estopped from raising them in subsequent litigation if they later come into controversy)

**ORDER**

The Grays are entitled to an easement by necessity as set forth above on Old Farm Lane and continuing as depicted on Exhibit V to the Eaton Lot. Counsel for the Grays shall submit a form of judgment, which shall include a description of the location as determined by this Decision.

Other parties shall have five days to object to the form of the judgment.

Dated at Montpelier, Vermont, this _____ day of May 2015.

_____
Mary Miles Teachout
Superior Court Judge