22CA0913 Crystal v Marrone 08-29-2024 COLORADO COURT OF APPEALS Court of Appeals No. 22CA0913 Summit County District Court No. 20CV30124 Honorable Mark D. Thompson, Judge Holly Crystal, Plaintiff-Appellant, v. Kathryn Marrone, Billy Joe North, Marilyn North, Gail M O’Malley Revocable Trust, and Parkside Townhomes 1, Defendants-Appellees. JUDGMENT AFFIRMED IN PART, REVERSED IN PART, AND CASE REMANDED WITH DIRECTIONS Division III Opinion by JUDGE SCHUTZ J. Jones, J concurs Johnson, J., concurs in part and dissents in part NOT PUBLISHED PURSUANT TO C.A.R. 35(e) Announced August 29, 2024 Lewis Roca Rothgerber Christie LLP, Kendra N. Beckwith, Elizabeth Michaels, Denver, Colorado; Gordon Rees Scully Mansukhani, LLP, Reagan Larkin, Denver, Colorado, for Plaintiff-Appellant Altitude Community Law P.C., William H. Short, Lakewood, Colorado, for Defendants-Appellees 
1 ¶ 1 Plaintiff, Holly Crystal, appeals the district court’s judgment entered against her and in favor of defendants, Kathryn Marrone, Billy Joe North, and Marilyn North (collectively, the Norths), Gail M. O’Malley Revocable Trust (O’Malley Trust), and Parkside Townhomes 1 (the Association).
1 We reverse in part, affirm in part, and remand for further proceedings. I. Background ¶ 2 The Parkside subdivision is a small townhome development in Frisco comprising four separate units and associated lots. The four units are contained within a single structure; they share a common roof and party walls. After building the structure, the developer recorded the “Declaration of Covenants, Easements, Restrictions and Homes Association Declaration” (Original Declaration) and associated “Plat Map” of the subdivision. The Original Declaration 1 The caption of the pleadings in the district court and on appeal name as a defendant “Parkside Townhomes 1.” But the operative documents refer to “Parkside Townhomes I.” The parties also sometimes refer to that defendant as “Parkside,” but generally refer to it as “the Association,” which we do as well. The named defendants are the Association and current and former unit owners of lots in the Parkside subdivision. 
2 created the Association, which is tasked with managing the subdivision’s units. ¶ 3 The survey map taken from the Plat Map
2 and pictured below, depicts the lots and building with the top of the reproduction bearing generally north. 2 The Plat Map of the subdivision has been cropped and enlarged to remove extraneous information, such as metes and bounds directional bearings, and references to adjacent properties. We have also highlighted the asserted common area in pink and the area asserted to be encumbered by the Access and Utility Easement in blue, as did the district court. 
3 ¶ 4 From west to east the four lots are 104A, 104B, 104C, and 104D. Lot 104A is on the eastern edge of the subdivision, Lot 104D is on the western edge, and Lots 104B and 104C are in between. The east-west property lines for each of the four lots extend from the southern boundary to the northern boundary of the subdivision. Thus, Lots 104A and 104D have a front yard, rear yard, and one side yard. Lots 104B and 104C have just front and rear yards. ¶ 5 At the time of construction, Lot 104A had a back door, but Lots 104B, 104C, and 104D had no back door. A back door was subsequently added to Lot 104B. ¶ 6 Each unit has an entry door and garage door located along the south side of the building. A public street abuts the southern edge of the property, and there is a shared driveway from this public street that permits each lot owner to access their respective garage doors and front entryways. ¶ 7 At the bottom of the Plat Map, just above the southern border of the subdivision, are the words “ACCESS AND UTILITY EASEMENT.” On either side of this phrase, there is a line that traverses the portions of the lots that are located south of the 
4 building, and both lines terminate with an arrow. One arrow ends at a perpendicular line drawn from the southwest corner of the building to the western border of Lot 104A, and the other ends at a perpendicular line drawn from the southeast corner of the building to the eastern border of Lot 104D. ¶ 8 The Plat Map illustrates the location of the shared driveway that traverses portions of all four lots. The Plat Map also depicts the locations of water lines, sewer lines, and electrical lines that traverse each of the four lots. None of the platted easements or utilities extend north of the southern edge of the building, except for a small portion of the respective water lines that serve Lots 104A and 104D. ¶ 9 The Original Declaration contains a recital clause stating, Declarant desires to create and establish, covenants, easements and restrictions on the above described real property for the use and benefit of themselves and grantees in order to construct, sell and preserve PARKSIDE TOWNHOMES I as a carefully protected complex of four individually owned mountain townhomes with the surrounding land on the above described real property developed for common use by the owners of said townhomes. Paragraph 3 of the Declaration provides, 
5 The common area on the plat . . . shall be subject to those easements for water, sewer and electrical lines, pipes, conduits and poles shown on said plat and each of the owners thereof shall have free ingress and egress in, from and over said easements for the purposes of the maintenance and repair thereof. Each owner shall be responsible for and shall pay for the maintenance and repair of utilities serving his townhome whether located on his property or common area and for the water, sewer and electricity utilized by him. Ownership of each unit shall entitle the owner or owners thereof to the right of ingress and egress through common area to and from his garage. Each owner shall be responsible for the maintenance of his garage access including, but not limited to, keeping the pavement material in good repair. ¶ 10 Paragraph 4 of the Original Declaration provides that no building, fence, wall, or other structure may be constructed on the common area absent prior approval by the Association. Similarly, paragraph 5 prohibits the parking of campers and the erection of temporary structures in the common area. ¶ 11 Paragraph 6 states that the Association agrees to act as the manager of the subdivision, and that the Association may “enter into and upon the townhome when necessary, and at times which 
6 cause the owner, . . . guests and invitees as little inconvenience as possible.” ¶ 12 Despite these references to a “common area,” the Original Declaration does not define that term, and neither the Declaration nor the Plat Map identify where any “common area” is located. Moreover, no portion of the subdivision is owned by the Association or otherwise under common ownership. Instead, the land and unit depicted on each lot are separately owned in fee by the owner of each lot. ¶ 13 Since the subdivision’s creation, the Association has been responsible for maintenance of the exterior of the building (including painting, staining, and roof repair) and the driveway. The Association also pays for mowing of the lawns, trimming and removing diseased trees, and snow removal. The Association imposes assessments on the unit owners to fund this maintenance and repair work. The district court found that between 1983 and 2014, the Association performed its inspections and maintenance responsibilities “without any dispute.” The court also found that the individual unit owners consented to the traversing of the lots in 
7 furtherance of the Association’s maintenance and repair obligations. ¶ 14 Crystal purchased Lot 104A in 2014. Marrone purchased Lot 104B in 2015 and owned it through November 2020. The Norths purchased Lot 104C in 1986 and owned it until the time of trial. The O’Malley Trust has owned Lot 104D since 1983, and its principal continuously lived there from 1983 until the time of trial. A. The Access Disputes ¶ 15 Disputes over the use of the side and rear yards of Lot 104A started before Crystal closed on her purchase. Three days before the closing, the Association passed a resolution in which it attempted to provide a definition of the term “common elements” under the Original Declaration. The resolution stated that the Plat Map “contains lot lines that seemingly conflict with” the Original Declaration’s recital clause that the Parkside subdivision would be a complex of “four individually owned mountain townhomes with surrounding land developed for common use by the owners of said townhomes.” The resolution purported to define “common elements” as “[a]ll unimproved ground within the community.” 
8 Crystal did not receive notice of the meeting at which the resolution was adopted and did not attend. ¶ 16 The passage of the resolution resulted in communications among the unit owners, the Association, and the Association’s legal counsel about the substance of the resolution. The minutes from the May 2015 Association meeting reflected the landowners’ agreement that “they own the respective lots as indicated on the plat; however, the properties are subject to the declaration and easements” and that the “easement at the front of the units is already described in the declaration.” There were also discussions about creating express easements along the side and rear of the lots. ¶ 17 The dispute over access to the side and rear yards continued over the next couple of years. Crystal contended that the Declaration did not create any easements across her side and rear yards. In a 2016 working session, the unit owners reiterated that “we all own our individual lots” and that “there are no common areas in [the Parkside subdivision].” The same meeting’s minutes state that there is an existing easement that covers “the whole front yard of all four units” and that the unit owners would “like to 
9 establish an easement along the side and back perimeter of the lots to allow Units B and C access to their backyards.” ¶ 18 Despite their discussion, the parties could not reach a resolution on the creation of express easements across the side and rear yards, and on one occasion, Crystal accused the other owners of trespass when they traversed her side and rear yards without her permission. Tensions escalated when the Association’s counsel prepared an “Amended Declaration” that purported to permit the Association and its members to “enter in or to cross over the Easement Area on any Lot” for maintenance purposes and to access the side and rear yards. The Amended Declaration did not describe where the contemplated easements were located, and though it attached a site map of a portion of the property, the site map did not depict the location of any easements. The Association approved the Amended Declaration by a three to one vote, with Crystal casting the lone opposing vote. B. The Trespass and Hot Tub Disputes ¶ 19 In the winter of 2019-20, ice and snow that had accumulated on the roof of Lot 104B (owned by Marrone) fell onto Crystal’s front deck. Crystal demanded that the Association and Marrone 
10 remediate the problem. When they refused, Crystal threatened to sue for trespass. Crystal also threatened legal action over the adoption of the Amended Declaration. ¶ 20 At about this time, the Association also issued a notice to Crystal asserting that she had violated the original covenants by installing a hot tub without the Association’s approval. C. The Litigation ¶ 21 Crystal filed suit against the Association and the unit owners, asserting five claims: (1) slander of title; (2) breach of fiduciary duty; (3) declaratory relief; (4) quiet title; and (5) trespass against Marrone. The Association counterclaimed, alleging that Crystal had failed to follow the covenants when she installed her hot tub. ¶ 22 Following a bench trial, the district court found in defendants’ favor on all claims. Crystal appeals, arguing that the district court erred by (1) finding that the Original Declaration and Plat Map created an express easement and/or common area across the side and rear yards of Lot 104A; (2) declaring implied easements of necessity and prescription across the side and rear yards of Lot 104A; (3) concluding that the Association had proved its counterclaim regarding installation of the hot tub in violation of the 
11 Declaration; (4) awarding defendants their costs and attorney fees; and (5) wrongfully denying her trespass claim against Marrone. Crystal also contends that, if the judgment is reversed, she is entitled to an award of attorney fees and costs incurred in the district court and on appeal.
3 II. The Express Easement ¶ 23 The district court began its analysis of the Association’s express easement claim by reviewing the content of the Original Declaration and Plat Map. The court noted that the Plat Map contains the words “ACCESS AND UTILITY EASEMENT” along the southern edge of the four lots, together with the extending arrows previously described. The court determined that this was an express access and utility easement created for the benefit of the Association and that it traverses all four of the front yards of all four lots, encompassing the area of the Plat Map, located on supra ¶ 3, that is highlighted in blue. 3 Crystal did not address her slander of title or breach of fiduciary duty claims on appeal, and therefore, neither do we. See People v. Carr, 2016 COA 168, ¶ 14. 
12 ¶ 24 Based on the district court’s findings and conclusions, the express Access and Utility Easement depicted on the Plat Map does not encumber any portion of the side yards of Lots 104A and 104D, nor any portion of the rear yards of Lots 104A, 104B, 104C, and 104D. And the court found that the Plat Map “does not label or identify any other lands as ‘easements.’” None of the parties contest these findings and legal conclusions. ¶ 25 After restricting the location of the express Access and Utility Easement to the front of the four Lots, the district court went on to analyze the Original Declaration’s use of the term “common area” to assess whether that language — coupled with the Plat Map — could be deemed to create an additional express easement. The court began by noting that the recital clause of the Original Declaration referred to “four individually owned mountain townhomes with the surrounding land on the above described real property developed for the common use by the owners of said townhomes.” The court then turned to paragraph 3 of the Declaration, which provides that “[t]he common area on the [Plat Map] . . . shall be subject to easements for water, sewer and electrical lines, pipes, conduits and poles shown on said [Plat Map] and each of the owners thereof shall 
13 have free ingress and egress in, from and over said easements for the purposes of maintenance and repair thereof.” The court also noted the same paragraph provides that each unit owner shall be entitled to “right of free ingress and egress through common area to and from his garage.” But the court also noted that the term “common area” does not appear on the Plat Map and is not defined in the Original Declaration. ¶ 26 Nevertheless, the court returned to the recital clause to infer that the developer intended that although each lot owner would have fee title to their property, all the surrounding land — including all front, side, and rear yards — would be burdened with an express easement benefitting the Association and unit owners to access the townhome and rear yards for installation, upkeep, repair, construction, and replacement and for improvements of the buildings, utilities, and lots. The court also “construe[d] the term ‘common area’ as used in the Original Declaration to include the areas lying outside of the Access and Utility Easement [i.e., the pink highlighted area of the Plat Map, supra, ¶ 3], exclusive of the building’s footprint.” 
14 ¶ 27 Crystal does not challenge the existence of an express easement across the front yard of Lot 104A for purposes of ingress, egress, access to and from the units and associated garages, utilities, and maintenance. But she argues that the terms of the Original Declaration and Plat Map, read alone and in combination with one another, provide no express easement beyond the front yards of the four lots. Relatedly, she argues that the Original Declaration and Plat Map do not create any “common area” across her side and rear yards. Thus, she argues, the district court erred as a matter of law by determining that an express easement and common area exist across the side and rear yards of Lot 104A. We agree. A. Standard of Review and Applicable Law ¶ 28 The district court’s conclusion that the side and rear yards of Crystal’s lot are subject to an express easement or are a common area presents a mixed question of fact and law. We review the district court’s factual findings for clear error and its legal conclusions de novo. Gold Hill Dev. Co., L.P. v. TSG Ski & Golf, LLC, 2015 COA 177, ¶ 7. Under the clear error standard, we will not disturb the court’s factual findings if there is any evidence in the 
15 record supporting them. Woodbridge Condo. Ass’n v. Lo Viento Blanco, LLC, 2020 COA 34, ¶ 24, aff’d, 2021 CO 56. ¶ 29 The construction and meaning of the language in a conveyancing instrument presents a question of law that we review de novo. Owens v. Tergeson, 2015 COA 164, ¶ 17 (“The interpretation of a deed and the determination of whether it is ambiguous are questions of law subject to de novo review by this court.”). ¶ 30 “An interest in real property, including an express easement, must be created by act or operation of law or [be] contained in a deed or conveyance . . . subscribed by the party creating or assigning the interest . . . .” City of Lakewood v. Armstrong, 2017 COA 159, ¶ 9; see § 38-10-106, C.R.S. 2024 (statute of frauds). An easement may be created by grant, prescription, or necessity, and once created, authorizes one to do or maintain something on the land of another. Lazy Dog Ranch v. Telluray Ranch Corp., 965 P.2d 1229, 1234 (Colo. 1998). “The property burdened by the easement is customarily known as the ‘servient estate,’ while the property benefited by the easement is called the ‘dominant estate.’” Id. An easement holder’s rights are measured by the nature and purpose 
16 of the easement. Id. The owner of the servient estate enjoys all the rights and benefits of ownership consistent with the burden of the easement; the rights of the owner of the dominant estate are limited to those allowed by the easement. Id. ¶ 31 The extent and scope of an express easement is determined by interpreting the conveyance instrument. Id. at 1235. “Words that clearly show the intention to grant an easement are adequate to demonstrate its creation, provided the language in the instrument is sufficiently definite and certain.” City of Lakewood, ¶ 10. No particular words are necessary, but the instrument “must identify with reasonable certainty the easement created and the dominant and servient tenements.” Hornsilver Circle, Ltd. v. Trope, 904 P.2d 1353, 1356 (Colo. App. 1995). “As a nonpossessory interest, an easement does not require the precise description that a possessory interest does.” City of Lakewood, ¶ 10. ¶ 32 “To determine whether an easement has been expressly granted — and, if it has, the extent of such easement — we look first to the deed or other conveyance instrument, construing it to ascertain the parties’ intent.” Gold Hill Dev. Co., ¶ 48 (citing Lazy Dog, 965 P.2d at 1235). 
17 ¶ 33 We must interpret an easement by considering (1) the language used in the instrument; (2) the circumstances surrounding its creation; and (3) the purpose for which it was created. Lewitz v. Porath Fam. Tr., 36 P.3d 120, 122 (Colo. App. 2001); see also Lookout Mountain Paradise Hills Homeowners’ Ass’n v. Viewpoint Assocs., 867 P.2d 70, 75 (Colo. App. 1993) (“Restrictive covenants must be construed as a whole and interpreted in view of their underlying purposes, giving effect to all provisions contained therein.”). B. Analysis of the Original Declaration and Plat Map ¶ 34 Applying these principles, we agree with the district court’s conclusion that the Original Declaration and Plat Map create an express easement for ingress, egress, access to and from the units and associated garages, utilities, and maintenance. The Plat Map clearly depicts the express easement as encompassing the lots’ front yards. But we conclude that the Plat Map equally clearly establishes that the Access and Utility Easement does not extend to the side or rear yards of the four lots. Indeed, as previously noted, the arrows depicting the location of the Access and Utility Easement extend across all four front yards; all utilities are located within the 
18 four lots (except for small portions of the water service lines serving 104A and 104D); and the driveway, garage, and front doors of the units are all located on the front of the building. Consistent therewith, the arrows depicting the Access and Utility Easement terminate at dotted lies extending from the face of the building in a perpendicular direction to the eastern and western boundaries of the subdivision. ¶ 35 Based on the clear notations of the Plat Map, we conclude that the only express easement that exists on the lots is across only the front yards. Stated otherwise, the Plat Map illustrates the developer’s clear intent to limit the express Access and Utility Easement to the front of the lots, and an equally clear intent not to extend the Access and Utility Easement into the lots’ side or rear yards. ¶ 36 The existence and specific location of the Access and Utility Easement also illustrate that the developer knew how to create and locate an express easement. And the Plat Map depicts no easements other that the Access and Utility Easement. These facts counsel against the expansion of the express Access and Utility Easement by implication or interpretation. 
19 ¶ 37 Nor are we persuaded that the Original Declaration’s references to “common use” and “common area” support a conclusion that the developer intended to extend an express easement or a common area across the side and rear yards of the lots. As the district court noted, the Original Declaration does refer to common area, but it does so in the context of referring to the utilities and access for ingress and egress to and from the public road to the respective units’ garages and doors. And these improvements are all located within the confines of the Access and Utility Easement that encumbers the lots’ front yards. Thus, these references to common area actually support limiting the location of the express easement and any common area to the front yards as depicted on the Plat Map. ¶ 38 In our view, the plain and unambiguous language of the Original Declaration and Plat Map create an express Access and Utility Easement across the front of all four lots for the purposes previously stated, and it creates no other express easements or a “common area” independent of the building and the lots’ front yards. Based on this conclusion, the district court’s analysis of the express easement claim should have ended. 
20 ¶ 39 But rather than stopping its analysis at this point, the district court determined that the Original Declaration’s references to the “common use of surrounding property” and a “common area” rendered the location of the Access and Utility Easement and the “common area” ambiguous. Perceiving an ambiguity, the court proceeded to consider the historical use of the property by the Association and unit owners and the circumstances existing at the time of platting to determine the intended location of the Access and Utility Easement. ¶ 40 The intention to create an express easement must be definitively stated: Words which clearly show the intention to give an easement are adequate to demonstrate its creation, provided the language in the instrument is sufficiently definite and certain in its terms. The writing must contain a description of the land that is to be subjected to the easement with sufficient clarity to locate it with reasonable certainty. Hornsilver, 904 P.2d at 1356 (citations omitted). If a conveying instrument is sufficiently clear to express the grantor’s intent to create an express easement, but its precise contours are not clear, the precise contours of the easement’s location may be determined 
21 based on the historical use of the property. See, e.g., Stevens v. Mannix, 77 P.3d 931, 933 (Colo. App. 2003) (“If a valid easement is granted without fixing in writing its location, the location may be determined based on the conduct of the parties.”); Gjovig v. Spino, 701 P.2d 1267, 1268 (Colo. App. 1985) (looking to historical use of the easement where there was no precise description of the easement’s location of ingress and egress over the servient estate). But these principles may not be utilized to create an express easement where the conveyancing instrument(s) — in this case, the Original Declaration and Plat Map — specifically delineate the location of the easement in question. Here, they do just that, limiting the Access and Utility Easement and any common area to the front yards. ¶ 41 Nonetheless, the district court proceeded to consider the parties’ historical use of the lots and whether such historical use evidenced an intent to include the side and rear yards as part of the Access and Utility Easement or common area. The court found that the owners of Lots 104B and 104C occasionally used the side and rear yards of Lot 104D to access their rear yards. And the court also found that the Association and unit owners occasionally 
22 traversed the side and rear yards to perform maintenance on the lawns and trees and the building’s exterior (such as painting and staining). But the court also found that these limited uses occurred with the individual unit owner’s consent. Thus, such usage is consistent with a limited license from the individual owner rather than a recognition that their side and rear yards were part of a common area or subject to the Access and Utility Easement. ¶ 42 The district court also grounded its extension of the Access and Utility Easement and common area by reference to the fact that, at the time of platting, only Lot 104A had a back door that allowed access to its rear yard. That fact was undisputed. But it doesn’t lead to the conclusion that the developer intended to extend the Access and Utility Easement beyond its illustrated points of termination, as depicted on the Plat Map. ¶ 43 Moreover, it does not follow from the absence of an existing back door that the other three units were deprived of access to their rear yards. Indeed, the O’Malley Trust unit has always enjoyed access to its rear yard from the Access and Utility Easement and the use of Lot 104D’s side lot and rear yard. And after the units were constructed, one of the owners of Lot 104B installed a back 
23 door to their unit providing direct access to their rear yard. The trial produced no evidence that the owner of Lot 104C is prohibited from installing a similar back door to access their rear yard. Perhaps they have chosen not to for aesthetic or financial reasons, or simply because — as the undisputed evidence established — they have always been granted permission to access their rear yard by the owner of Lot 104D. In any event, as the facts illustrate, the absence of back doors on three of the units at the time of platting does not support a conclusion that the developer intended to extend the easement or common area across the side or rear yards of the lots. ¶ 44 In sum, neither the language of the Original Declaration and Plat Map, the circumstances existing at the time the easement was created, nor the historical use of the lots supports the district court’s legal conclusion that the developer intended either the Access and Utility Easement or the common area to extend into the side or rear yards of Lot 104A. To the contrary, the clear controlling language of the Original Declaration and Plat Map establish that the Access and Utility Easement and common area encumber only the lots’ front yards. By declaring that the side and rear yards are 
24 encumbered by an Access and Utility Easement and part of a common area, the district court erred as a matter of law. C. Analysis of the Amended Declaration ¶ 45 After concluding that the Access and Utility Easement and common area encompassed the side and rear yards, the court turned to the enforceability of the Amended Declaration. The Amended Declaration was recorded in May 2020, after it was approved by Marrone, the Norths, and the O’Malley Trust over Crystal’s objection. The Amended Declaration did not purport to define or designate any common area. But it included the following definitions of “Easement Area” and “Map”: (h) “Easement Area” shall mean that area depicted on the Map of the Association and which is attached hereto and incorporated herein by reference. The Easement Area shall be owned in fee simple by the Owners of the Lot and not by the Association as common area as that term is defined in [the Colorado Common Interest Ownership Act]. . . . . (k) “Map” . . . shall mean and refer to the map(s) and/or plat(s) of the Property and improvements that are subject to this Declaration and which are designated in the Map or Plat recorded in the records of the 
25 Office of the Clerk and Recorder of Summit County. As the district court noted, the only map attached to the Amended Declaration was a site plan that it characterized as the “Snow Storage Map.” In any event, that attached document did not depict any lot lines or easement areas. Moreover, as addressed above, the Plat Map did not depict any easement area beyond the lots’ front yards. Nevertheless, the district court concluded that the “Easement Area” described in the Amended Declaration extended to the entirety of the front, side, and rear yards of all four lots in the subdivision. ¶ 46 From this conclusion, the court reasoned that the Easement Area purportedly created by the Amended Declaration was “consistent and coextensive with the nature, scope, purpose and area, and [did] not operate to expand, the express and implied easements encumbering Lot 104A” under the Original Declaration and Plat Map. In other words, having previously concluded that the Access and Utility Easement and common area encompassed the front, side, and rear yards of all lots, the court concluded that the Amended Declaration simply created coextensive easements in the 
26 same location, and thus rejected Crystal’s argument that the Amended Declaration was passed in violation of her due process rights. ¶ 47 We reject the district court’s conclusion regarding the Amended Declaration for multiple reasons. First, we have previously concluded that the Original Declaration and Plat Map did not create an easement or common area on the side or rear yards of the lots. Thus, to the extent that the Amended Declaration purports to create an easement on the side and rear yards, it must stand on its own. Second, the only document attached to the Amended Declaration was the site plan that depicted no easements. ¶ 48 Third, the fact that the Association elected to create and file an Amended Declaration to create an express easement that already existed under the Original Declaration and Plat Map is illogical. At the very least, the creation of the Amended Declaration illustrates that the unit owners and Association were not confident that the Original Declaration and Plat Map were sufficiently definite and certain to create an express easement. And contrary to the district court’s finding that the side and rear yards were part of a common 
27 area, the Amended Declaration does not purport to identify or create any common area across any property. ¶ 49 Finally, and most importantly, even if the uncertainties created by the Amended Declaration’s language and its attachment could be overcome, reading these documents in a manner that places an access and utility easement on Crystal’s property would amount to a taking of Crystal’s property without due process of law. ¶ 50 As a quasi-governmental body, the Association must enforce a declaration in a manner that complies with due process. See C & C Invs., LP v. Hummel, 2022 COA 42, ¶ 40. The Association points to no authority, and we are aware of none, that permits an Association to place an express easement on a unit owner’s property without the owner’s consent. An express easement is created by an appropriate conveyance from the property owner to the beneficiary. Gold Hill Dev. Co., ¶ 47. That fundamental principle does not disappear in lots located within a homeowner’s association’s jurisdiction. Thus, the fact that the Amended Declaration was approved by a majority vote of the Association’s members is inconsequential. The only person who could approve the creation of an express easement across Crystal’s property was Crystal. 
28 ¶ 51 In sum, the Amended Declaration did not reiterate an express easement or common area on Lot 104A’s side and rear yards because no such easements or common area existed prior to the filing of the Amended Declaration. Second, the Amended Declaration could not and did not create an easement or common area across Lot 104A’s side and rear yards without Crystal’s consent. Thus, the district court erred by concluding that the Amended Declaration either created or confirmed an express easement and common area across the side and rear yards of Lot 104A. III. Implied Easements ¶ 52 In addition to finding of express easement, the district court also concluded that the side and rear yards of the lots are encumbered by an “implied easement of necessity” to “access the sides and rear areas of the [l]ots for general use and to perform installation, maintenance, repair, upkeep, and replacement of the improvements located upon their lots.” The court also found that the Association and unit owners had established an “easement by prescription.” The court did not, however, define the location or permitted uses associated with the prescriptive easement. 
29 ¶ 53 In reaching these conclusions, the court cited no legal authority setting forth the elements necessary to establish an easement by necessity or a prescriptive easement. A. Standard of Review ¶ 54 As with an express easement, the district court’s findings of implied easements by necessity and prescription present mixed questions of fact and law. See Fear v. GEICO Cas. Co., 2023 COA 31, ¶ 15 (“We review a trial court’s judgment entered following a bench trial as a mixed question of fact and law.”) (cert. granted Feb. 26, 2024). B. Applicable Law ¶ 55 To establish an easement by necessity, a claiming party must establish each of the following elements: (1) unity and subsequent separation of title; (2) obvious benefit to the dominant and burden to the servient tenement existing at the time of the conveyance; and (3) necessity for the easement. Wagner v. Fairlamb, 379 P.2d 165, 168 (Colo. 1963). In Wagner, the supreme court noted that the “third requirement is that the necessity for the particular right-of-
way be great.” Id. 
30 ¶ 56 To establish a prescriptive easement, a party must establish that “the prescriptive use is: 1) open or notorious; 2) continued without effective interruption for the prescriptive period; and 3) the use was either a) adverse or b) pursuant to an attempted, but ineffective grant.” Lo Viento Blanco, 2021 CO 56, ¶ 16 (quoting Lobato v. Taylor, 71 P.3d 938, 950 (Colo. 2001)). In the context of a prescriptive easement, the term adverse means a use made without consent of the landowner, or holder of the property interest used, and without other authorization. Adverse uses create causes of action in tort for interference with property rights. The causes of action are usually actions for trespass, nuisance, or waste. [Such] uses are adverse or hostile to the property owner in the ordinary sense of the words. Restatement (Third) of Prop.: Servitudes § 2.16 cmt. b (Am. L. Inst. 2000)); Lo Viento Blanco, ¶ 20. ¶ 57 As noted, the district court made no factual findings to support its conclusion that the defendants established any of these elements. But based on the undisputed facts, we conclude, as a matter of law, that the evidence was insufficient to establish an easement by necessity or prescription. 
31 C. Analysis of Implied Easements 1. Prescriptive Easement ¶ 58 We conclude that the undisputed facts do not support a finding that there was adverse use of the side or rear yards of Lot 104A for the prescriptive period of eighteen years. See § 38-41-
101(1), C.R.S. 2024 (Colorado’s period of prescription is eighteen years); Lobato, 71 P.3d at 954. As the district court found, between 1983 and 2014, there was no evidence of any objection from any party to the use of any portion of the lots. Thus, any use of the side and rear yards was consensual and not adverse during this period. Even if we assume, for sake of argument, that the unit owners and Association used the side and rear yards of Lot 104A without Crystal’s consent, Crystal did not acquire Lot 104A until 2014, eight years before the trial. Any adverse use of Lot 104A during this period was therefore insufficient to demonstrate the eighteen-year period of adverse use required to establish a prescriptive easement. ¶ 59 Moreover, the district court provided no analysis of the particular adverse use that may have been made of Lot 104A or how any such use justified its finding of a prescriptive easement for 
32 “general use and to perform installation, maintenance, repair, upkeep and replacement of the improvements located on [the lots].” ¶ 60 In sum, the district court’s finding of a prescriptive easement across the side and rear yards of Lot 104A is not supported by the court’s factual findings, and the undisputed facts refute, as a matter of law, the court’s finding of a prescriptive easement across Lot 104A. 2. Easement by Necessity ¶ 61 We also conclude that the undisputed facts fail to establish the existence of an easement by necessity. First, the undisputed evidence at trial established that the O’Mally Trust has always permitted the owners of Lots 104B and 104C to cross the side and rear yards of Lot 104D to access their rear yards. And, of course, the O’Malley Trust unit owners have direct access to their rear yard. Moreover, Lot 104B now has a back door that provides direct access to the lot’s rear yard. And there was no showing that a similar door could not be installed by the owner of Lot 104(c). ¶ 62 As previously noted, the district court found that the unit owners have historically cooperated in permitting the Association’s maintenance and upkeep of the building and lots. Thus, there was 
33 insufficient evidence to support a finding that extending the express Access and Utility Easement across the side and rear yards was necessary to permit maintenance and upkeep of the exterior of the building or the lots. ¶ 63 Under these circumstances, we conclude there was insufficient evidence to show that an easement was necessary for the owners to obtain access to their rear yards or for the Association to maintain and repair the buildings and lots, and therefore, the evidence certainly did not show the type of “great necessity” that would establish an easement by necessity. See Wagner, 379 P.2d at 168. Thus, the district court erred as a matter of law by finding an easement by necessity across the side and rear yards of Lot 104A. IV. Hot Tub ¶ 64 Crystal contends that the district court erred by concluding that the Association proved its claim that she breached the covenants by failing to seek and obtain the Association’s approval prior to installing the hot tub. A. Additional Facts ¶ 65 Without seeking prior approval from the Association, Crystal installed a hot tub in her rear yard. The Association sent her a 
34 demand letter. While that demand was pending, Crystal filed this lawsuit. Defendants filed a counterclaim to enforce the prior approval provisions of the Original Declaration and Amended Declaration. Crystal complied with the Association’s permitting requirements after the counterclaim was filed but before trial. In its judgment, the district court concluded that the Association had proved “its counterclaim for a breach of covenants” and was entitled to attorney fees in pursuing the counterclaim. B. Analysis ¶ 66 The parties dispute whether this issue was preserved and, if so, whether the Association provided Crystal with due process in accordance with its enforcement policy. We need not resolve this dispute because we conclude the claim is moot. ¶ 67 In her opening brief, Crystal argues that “[t]he purported hot tub violation was resolved during litigation, rendering the counterclaim moot.” We agree that this claim was rendered moot by the parties’ settlement, except for its possible impact on the attorney fees issues in this case. See Dahlem v. Bd. of Educ. of Denver Pub. Schs., 901 F.2d 1508, 1512 (10th Cir. 1990) (“While a claim of entitlement to attorney’s fees does not preserve a moot 
35 cause of action, the expiration of the underlying cause of action does not moot a controversy over attorney’s fees already incurred.”) (citations omitted). ¶ 68 “Courts must confine their exercise of jurisdiction to cases that present a live case or controversy.” Davidson v. Comm. for Gail Schoettler, Inc., 24 P.3d 621, 623 (Colo. 2001). “A case is moot when a judgment, if rendered, would have no practical legal effect upon the existing controversy.” Van Schaack Holdings, Ltd. v. Fulenwider, 798 P.2d 424, 426 (Colo. 1990). “The general rule is that when issues presented in litigation become moot because of subsequent events, an appellate court will decline to render an opinion on the merits of an appeal.” Id. at 426-27. ¶ 69 Crystal complied with the Association’s prior approval policy after the counterclaim was filed but before trial. This resolved the merits of the enforceability of the covenant at issue, and any defenses related thereto. Thus, the various covenant interpretation and due process issues raised by Crystal in her briefing on appeal are all moot. ¶ 70 The only issue that remains on the counterclaim is whether either party is entitled to recover its related costs and attorney fees. 
36 We address this issue, and the parties’ additional claims for attorney fees for various other claims, in a companion opinion, Crystal v. Marrone, (Colo. App. No. 22CA1847, Aug. 29, 2024) (not published pursuant to C.A.R. 35(e)) (Crystal II). V. Trespass ¶ 71 Crystal contends that the district court wrongfully denied her trespass claim. We disagree. A. Additional Facts ¶ 72 The building’s gabled roof slopes downward over Lot 104B and then extends over the party wall such that the eve of the roof is above Lot 104A. Crystal expanded her front deck so that it now extends past the roof overhang of Lot 104B. The accumulated snow and ice from Lot 104B’s roof now sometimes falls onto Crystal’s extended deck and adjacent landscaping on the front side of Lot 104A. Crystal brought this to Marrone’s attention, who declined to address the issue, noting that the roof at issue traverses the property boundary between Lots 104A and 104B and was thus not her responsibility. ¶ 73 The current roof design between Lots 104A and 104B is the same as the shared roofs between the other units, and there is no 
37 evidence that Marrone constructed, modified, or otherwise altered the roof between the two units. B. Standard of Review and Applicable Law ¶ 74 Whether an improvement that causes a natural element to flow onto another’s property constitutes a continuing trespass is a question of law that we review de novo. Sanderson v. Heath Mesa Homeowners Ass’n, 183 P.3d 679, 682 (Colo. App. 2008). ¶ 75 A trespass is a physical intrusion upon the property of another without permission from the person legally entitled to possession of that property. Public Serv. Co. of Colo. v. Van Wyk, 27 P.3d 377, 389 (Colo. 2001). “A landowner who sets in motion a force which, in the usual course of events, will damage property of another is guilty of a trespass on such property.” Hoery v. United States, 64 P.3d 214, 217 (Colo. 2003). ¶ 76 A trespass may be isolated to a single occurrence, continuing, or permanent in nature. Id. at 218. Generally, a party has the obligation to remediate an isolated or continuing trespass that they created. Sanderson, 183 P.3d at 682. But in exceptional circumstances — for example, an irrigation ditch or a railroad — a continuing trespass may be allowed to exist indefinitely, thereby 
38 creating a permanent trespass. Hoery, 64 P.3d at 220. A permanent trespass must be a socially beneficial structure constructed with “lawful authority” and intended to be permanent. Id. C. Analysis ¶ 77 On appeal, both parties rely on Cobai v. Young, 679 P.2d 121 (Colo. App. 1984). In Cobai, snow and other materials from the defendants’ roof fell onto the Cobais’ home. Id. at 123. The Cobais’ house was built in the 1930s in Crested Butte, which averages between 300 and 500 inches of snowfall annually. Id. The defendants built their home in the 1970s based on new zoning setback requirements resulting in both the roofs sloping toward one another. Id. Because the Cobais’ house was one story and the defendants’ house was two stories, the sliding snow from the defendants’ house would strike the Cobais’ house causing thunderous noise, jarring, nonstructural damage, and potential future structural damage. Id. ¶ 78 A division of this court concluded that the trespass was continuing because “[a] landowner who sets in motion a force which, in the usual course of events, will damage property of 
39 another is guilty of trespass on such property.” Id. (quoting Miller v. Carnation Co., 516 P.2d 661, 664 (Colo. App. 1973)). The division also concluded the district court properly found the “defendants control on their property [to be] an instrumentality which sets in motion a force which, in the usual course of events, will damage the Cobais’ property.” Id. Thus, the division affirmed the court’s ruling granting a permanent injunction prohibiting the defendants from allowing snow to slide off their roof onto the Cobais’ property. Id. at 122-23. ¶ 79 Crystal argues that because Marrone controls the instrumentality (i.e., the roof of Lot 104B’s unit) that sets the snow into motion, the elements of a continuing trespass are proven. In rejecting the trespass claim, the district court reasoned, [T]here is no evidence that Ms. Marrone engaged in an intentional act on her property — Lot 104B — that set the snow and ice in motion. Ms. Marrone acquired Lot 104B as originally constructed and as part of the building enclosing the dwelling unit on Lot 104A. There is no evidence that Ms. Marrone modified, altered, or constructed any improvement on the roof of Lot 104B that set the snow and ice in motion. Rather, the snow and ice accumulated on the original roof over both Lot 104B and Lot 104A and slid off in the 
40 natural course and not as a result of any action by Ms. Marrone. ¶ 80 We perceive no error in this analysis. Marrone did not put into action the mechanics by which snow fell onto Crystal’s deck, because the roof was built in 1983, and there was no evidence that Marrone modified or updated the roof. In short, Marrone did nothing to create the roof conditions that caused snow to be projected onto Crystal’s property. Moreover, it appears such snow sloughing has occurred from the time the building was constructed and only became an issue when Crystal extended her deck to the point that a portion of it was located beneath the point where the snow naturally fell from the roof. Given these undisputed facts, we perceive no error in the district court’s rejection of Crystal’s trespass claim. VI. Attorney Fees ¶ 81 We address all attorney fee issues arising out of the litigation — whether at the district court or appellate level — in Crystal II. 
41 VIII. Conclusion ¶ 82 We reverse that portion of the district court’s judgment finding the existence of an express easement, a prescriptive easement, or an easement by necessity on the side and rear yards of Lot 104A. We also reverse the district court’s finding that the side and rear yards of Lot 104A are common areas. We dismiss as moot Crystal’s challenge to the merits of whether she violated the covenants by installing the hot tub. And we affirm the district court’s entry of judgment against Crystal on her trespass claim. Finally, we resolve the parties’ competing claims for attorney fees in Crystal II. JUDGE J. JONES concurs. JUDGE JOHNSON concurs in part and dissents in part.
42 JUDGE JOHNSON concurring in part and dissenting in part. ¶ 83 I agree with the majority’s analysis in Parts IV (Hot Tub) and V (Trespass). But I disagree with the majority’s conclusion that the Access and Utility Easement identified in the Plat Map and Original Declaration is limited to the front of all four lots and creates no other express easements or “common area” extending to the sides and part of the back of the lots. Because I conclude that there was an express easement, I respectfully dissent from Part II (The Express Easement) and therefore do not need to reach Part III (Implied Easements). Finally, for the reasons laid out in the opinion in the companion appeal involving the attorney fees issue, I also dissent from Part VI (Attorney Fees). I would, therefore, affirm the district court’s order, albeit on slightly different grounds. ¶ 84 I conclude that the Plat Map and Original Declaration construed together create an express easement on the “common area” of the Plat Map that extends the current Access and Utility Easement to the sides of Lots 104A and 104D for ingress and egress to the individual lot’s backyards for the limited purpose of performing maintenance, inspection, repair, installation, and 
43 upkeep as needed; to access the townhomes; and to reach or facilitate access to the rear of the lots. ¶ 85 The majority is correct that the line representing the Access and Utility Easement on the Plat Map does not extend beyond Crystal’s side and backyard. But based on the language of the Original Declaration, as interpreted with the Plat Map, as well as the construction of the Parkside subdivision at the time the Original Declaration was recorded, and the historical use, the district court properly determined that the conveyance documents establish an express easement that extends the Access and Utility Easement around the side of the lots and to the rear yards. I do not agree with the district court, however, that the easement encompasses the entirety of the lots’ backyards. I reach these conclusions for three reasons. I. Plat Map and Original Declaration ¶ 86 First, the Plat Map read in conjunction with the Original Declaration creates an express easement that extends through the side lots to the rear of the building. Paragraph 1 of the Original Declaration incorporates by reference the Plat Map. And the Original Declaration must be harmonized with the Plat Map. See 
44 Snowmass Land Co. v. Two Creek Homeowner’s Ass’n, 159 P.3d 662, 663 (Colo. App. 2006). The majority contends and the Plat Map demonstrates that the arrows depicting the Access and Utility Easement terminate at the dotted lines that extend from the face of the building. But this interpretation fails to harmonize the Plat Map with the Original Declaration. See Lookout Mountain Paradise Hills Homeowners’ Ass’n v. Viewpoint Assocs., 867 P.2d 70, 75 (Colo. App. 1993) (“[C]ovenants must be construed as a whole and interpreted in view of their underlying purposes, giving effect to all provisions contained therein.”). Simply because the Plat Map, standing alone, does not denote the exact location of an easement extending to the side yards of Lots 104A and 104D and around to the back north area of Lots 104B and 104C does not mean an easement does not exist in those areas. See City of Lakewood v. Armstrong, 2017 COA 159, ¶¶ 10-11 (“As a nonpossessory interest, an easement does not require the precise description that a possessory interest does. . . . [A] lack of specificity in describing an easement’s location will ordinarily not invalidate it. The general rule is that vagueness in describing the easement ‘does not go to the existence or validity of an easement,’ but ‘an extreme case of 
45 vagueness could result in a holding that no easement was granted.’”) (citations omitted). ¶ 87 The Original Declaration begins with a “whereas” clause that defines the Parkside subdivision “as a carefully protected complex of four individually owned mountain townhomes with the surrounding land on the above described real property developed for common use by the owners of said townhomes.” (Emphasis added.) This clause contemplates that the general plan of development was to subject the common area to use by all unit owners and that such common area was to include the surrounding land. ¶ 88 Although the term common area is undefined, it is partially clarified in paragraph 3 of the Original Declaration: The common area on the plat of Parkside Townhomes I (sic) shall be subject to those easements for water, sewer and electrical lines, pipes, conduits and poles shown on said plat and each of the owners thereof shall have free ingress and egress in, from and over said easements for the purposes of maintenance and repair thereof. (Emphasis added.) And that same paragraph also says, “Ownership of each unit shall entitle the owner or owners thereof the right of 
46 ingress and egress through common area to and from his garage.” (Emphasis added.) ¶ 89 Paragraph 6 of the Original Declaration identifies the Association as the manager of the development, which has the right “[t]o enter into and upon the townhome when necessary, and at times which cause the owner, his guests and invitees as little inconvenience as possible.” And paragraph 6 also indicates that the Association has access to complete its performance obligations, including maintenance, repair, inspections, and upkeep of the multi-unit townhomes. See Kroesen v. Shenandoah Homeowners Ass’n, 2020 COA 31, ¶ 31 (“We give words and phrases their common meanings and will enforce recorded instruments as written if their meaning is clear.”); see also Lazy Dog Ranch v. Telluray Ranch Corp., 965 P.2d 1229, 1237 (Colo. 1998) (“[T]he language used in creating a servitude ordinarily should be interpreted to accord with the meaning an ordinary purchaser would ascribe to it in the context of the parcels of land involved.”) (citation omitted); Restatement (Third) of Prop.: Servitudes § 2.14(2)(a) (Am L. Inst. 2000) (“Language of condition that creates a restriction or other obligation, in order to implement the general plan, creates an 
47 implied servitude imposing the same restriction or other obligation.”). ¶ 90 Reading the “whereas” clause, paragraph 3, and paragraph 6 together in conjunction with the Plat Map, it is reasonably certain that the surrounding land is for the “common use” of the unit owners to access their rear yards and for the Association to perform its duties. See Pulte Home Corp. v. Countryside Cmty. Ass’n, 2016 CO 64, ¶ 23 (we must read covenants as a whole to harmonize and effectuate all provisions). Without the express easement, all the unit owners would have access to their units from the south portion of the property but only the corner lots would be able to reach their rear yards. Therefore, the term “access” must refer to something greater than just access to the south portion of the property. See Lewitz v. Porath Fam. Tr., 36 P.3d 120, 122 (Colo. App. 2001) (“[W]e must consider the language used in the instrument, the circumstances surrounding its creation, and the purpose for which it was created.”). Indeed, I agree with the district court’s conclusion that reading the Original Declaration and Plat Map together to limit unit owners’ use of the Access and Utility Easement to the south side of the building would “render much of the exterior of the 
48 building inaccessible and all of the rear yards of two the Lots entirely without any access.” See Gold Hill Dev. Co., L.P. v. TSG Ski & Golf, LLC, 2015 COA 177, ¶ 51 (“[T]he law assumes that no person intends to render property conveyed inaccessible for the purpose for which it was [g]ranted.” (quoting Wagner v. Fairlamb, 379 P.2d 165, 169 (Colo. 1963))). II. Extrinsic Evidence ¶ 91 Second, even if there exists a “measure of ambiguity” when harmonizing the Original Declaration language with the Plat Map, extrinsic evidence may be utilized to explain and give context to the language and to determine the actual intent of the parties. See Precious Offerings Min. Exch., Inc. v. McLain, 194 P.3d 455, 458 (Colo. App. 2008) (“[A] court may find an express easement, where a writing which purportedly conveys an easement is ambiguous, based on extrinsic evidence to determine ‘the actual intention of the parties’ and ‘to explain and give context to the language.’” (quoting Lazy Dog, 965 P.2d at 1236-37) (Extrinsic evidence depicting “the location and character of the properties burdened and benefited by the servitude, the use made of the properties before and after creation of the servitude, the character of the surrounding area, the 
49 existence and contours of any general plan of development for the area, and consideration paid for the servitude” is relevant to interpreting the language of a servitude. (quoting Restatement (Third) of Prop.: Servitudes § 4.1 cmt. d (Am. L. Inst. 2000))); see also Stevens v. Mannix, 77 P.3d 931, 933 (Colo. App. 2003) (“If a valid easement is granted without fixing in writing its location, the location may be determined based on the conduct of the parties.”); see also Gjovig v. Spino, 701 P.2d 1267, 1268 (Colo. App. 1985) (looking to historical use of the easement where there was no precise description of the easement’s location of ingress and egress over the servient estate). ¶ 92 The majority contends that it was error for the district court “to consider the historical use of the property by the Association and unit owners and the circumstances existing at the time.” Supra, ¶ 39. But any measure of ambiguity requires consideration of the surrounding circumstances when the Original Declaration was recorded and the use of the easement after its creation. In 1983, the townhome complex was built so that only Lot 104A’s unit had a back door to access the lot’s backyard, while the other three lots did not have back doors. See Lazy Dog, 965 P.2d at 1237 (the 
50 location and character of the properties and the character of the surrounding area are relevant to interpreting an express easement). The easement allowed the owners of Lots 104B and 104C to access their backyards by having access to the side yards of Lots 104A and 104D and allowed the Association to conduct maintenance of the building and surrounding common area. See City of Lakewood, ¶ 10 (“The instrument instead must identify with reasonable certainty the easement created and the dominant and servient tenements.”). ¶ 93 And the record demonstrates that the unit owners were not freely using each other’s backyards for general purposes. See Lazy Dog, 965 P.2d at 1237 (the use made of the property after the creation of the servitude is relevant to interpreting an ambiguous express easement). Instead, the unit owners historically interpreted and used the easement to access the side and rear yards for access to their own backyards and for maintenance or repair of the exterior of the townhomes and shared utilities. See Gjovig, 701 P.2d at 1268 (looking to historical use of the easement to determine its location). Specifically, the Association used the easement to facilitate its duties, including but not limited to, installations, inspections, maintenance, snow plowing and stacking of excess 
51 snow, painting and staining the building, and access to the rear yards. See id. III. Scope of Express Easement ¶ 94 I agree with Crystal and the majority, though, that the district court’s finding of an express easement that extends the Access and Utility Easement to the entire “surrounding” land” of the property would allow all unit owners unlimited ingress and egress to the entire north side of Lots 104A through 104D to access the abutting open space. In that case, the scope and purpose of the express easement would be contrary to the grant of fee simple for each owners’ backyard. But this is not fatal to the finding of an express easement. ¶ 95 Nothing in the Plat Map or Original Declaration indicates that the express easement permits the Association or the owners to use the side yards of Lots 104A or 104D or any portion of their rear yards for anything other than accessing the individual unit’s backyards or furthering the Association’s performance of its duties requiring access to the rear of the individual lots for maintenance and upkeep, which, contrary to the district court’s conclusion, would not grant access to the entirety of the north lot. 
52 ¶ 96 In sum, when construing the Plat Map and Original Declaration together, I would conclude that the Association and its members have an express easement on the “common area” of the subdivision (which extends the current Access and Utility Easement to the sides of Lots 104A and 104D for ingress and egress to the individual backyard lots. But the “common area” which is subject to “common use” by all owners would be limited to ingress and egress as necessary for an owner to access their individual lot’s backyard or for the Association maintain any and all utilities or perform other maintenance and upkeep that benefits the entire development. The unit owners and Association would not have ingress and egress to the entire north side of the Plat Map; instead, I would limit the express easement to the scope and breadth necessary for the Association and the unit owners to have a nonexclusive right on, over, under, and across the common area to access their individual lot’s backyards or for the Association to perform maintenance, inspection, repair, installation, and upkeep 
53 as needed on the building; to access the townhomes; and to reach or facilitate complete access to the rear of the lots.
1 1 I would agree with the district court that the easements articulated in sections 2.4 and 2.6 of the Amended Declaration are consistent with and coextensive of the nature, scope, purpose, and area of the express easement that existed over Lot 104A under the Original Declaration. The provisions do not operate to expand the easement that encumbered the property but merely clarify the existing easement.